# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2484-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JEFF S. BANATTE, a/k/a
JEFF Y. BANATTE,

    Defendant-Appellant.

_____

Submitted November 6, 2024 – Decided December 2, 2024

Before Judges Firko and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 21-05-0232.

Helmer, Conley & Kasselman, PA, attorneys for appellant (Patricia B. Quelch, of counsel and on the brief).

William A. Daniel, Union County Prosecutor, attorney for respondent (Milton S. Leibowitz, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant appeals from his jury trial conviction for first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(2)(a), third-degree aggravated assault, N.J.S.A. 2C:14-3(a), and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1).  The court sentenced defendant to a twelve-year term of imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, Megan's Law requirements, N.J.S.A. 2C:7-1 to -23, and parole supervision for life (PSL), N.J.S.A. 2C:43-6.4.  Defendant challenges his conviction and sentence and raises the following points for our consideration:

POINT I

THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING FRESH COMPLAINT TESTIMONY.

POINT II

THE STATE AND COURT COERCED THE WITNESS'S TESTIMONY, REQUIRING REVERSAL OF DEFENDANT'S CONVICTION.

POINT III

THE COURT ERRED BY PERMITTING EVIDENCE OF SEXUAL ABUSE DURING THE NEW YORK CAMPING TRIP TO BE PRESENTED TO THE JURY PURSUANT TO N.J.R.E. 404(b).

A-2484-22

POINT IV

A MISTRIAL SHOULD HAVE BEEN REQUESTED AND GRANTED, REQUIRING REVERSAL OF DEFENDANT'S CONVICTION.

POINT V

DEFENDANT IS ENTITLED TO A NEW TRIAL DUE TO CUMULATIVE ERROR.

POINT VI

DEFENDANT'S SENTENCE IS EXCESSIVE.

We reject all of the arguments and for the reasons that follow, we affirm.

I.

Factual Background

We derive the following facts from the record. Defendant began dating R.D.'s[1] mother, L.B., when R.D. was only four years old. Defendant married L.B. when R.D. was nine years old and was father to R.D.'s half-brother, T.B. R.D. reported that before the touching started, she and a normal relationship with defendant and "treated him like a father."

---

[1] The use of initials and pseudonyms is intended to protect the confidentiality and identity of the child victim pursuant to N.J.S.A. 2A:82-46(a) and Rule 1:38-3(c)(9).

Defendant began sexually assaulting R.D. when she was thirteen years old. At the time, R.D. lived in Irvington with L.B., T.B., defendant, and his mother. In Irvington, R.D. slept on a loft bed that was located next to the kitchen. R.D. testified that defendant would "touch my leg and squeeze it and it would hurt." Defendant also stated that in Irvington on one occasion, "I remember I was sleeping and someone tried to wake me up but I was really tired so I kept falling back to sleep. And I was touched inappropriately and I woke up when [defendant] was leaving and I texted one of my friends at the time." When asked what "touched inappropriately" meant, R.D. replied "[o]n my vagina." In Irvington, R.D. told a friend, Regina, about defendant touching her through a phone application related to fans of BTS, the South Korean band.

After living in Irvington, R.D. and her family moved to Newark to live at her grandmother's house. In Newark, R.D. claimed defendant would touch her "[v]ery often." She testified,

> I moved my bunk bed in the living room of the house and I would sleep up there with my cousin and I remember he'd, like, reach over my cousin and he touched me inappropriately. I would take a pillow to try and block it. He reached under the pillow."

R.D. testified that defendant's inappropriate touching was on her "[v]agina." On one specific occasion,

A-2484-22

> [i]t was me, my mom, my brother and my cousin on one bed because we accidentally fell asleep early, and I remember being touched. So I woke up and he walked somewhere. I don't remember where. And then I walked to the living room to sleep on my bed instead, and then my cousin woke up when he felt me wake up and followed me and slept in the living room.

The family then moved to Scotch Plains where R.D. shared a bedroom with T.B. In their bedroom, R.D. and T.B. had beds across the room from each other. In Scotch Plains, defendant touched R.D. "[a]lmost every night" and one "hundred" percent of them would be on her vagina. On one occasion, while R.D. was sleeping in her room, defendant touched her vagina, over her clothes, moving his hand in circles. A separate incident occurred in the Scotch Plains home occurred before COVID-19 quarantine that R.D. recalled as,

> I was sleeping and my shorts were moved and myself being touched inappropriately, I tried to get up. And I was going to go walk but then I was grabbed and held down, and then, um, I told [defendant] to get off and he pretended to be just hugging me and left the room.

She further elaborated that he put his knuckle "like, halfway" into the lips of her vagina and that he knocked on her vagina "[m]aybe ten" times.

On July 20, 2020, defendant touched R.D. for the last time while camping in upstate New York. R.D. was fifteen years old at the time. R.D., L.B., T.B., defendant, and R.D.'s cousin all went on the camping trip together for T.B.'s

birthday. The family stayed in a tent with two beds with R.D., T.B., and their cousin in one bed, and defendant and L.B. in another bed. R.D. woke up in the middle of the night to defendant rubbing her vagina over her clothes. When R.D. woke up, defendant walked away, and no one saw what had happened.

On July 22, 2020, R.D. texted defendant and told him that she knew what he was doing and wanted him to stop touching her. R.D. stated the following:

> Dear [y]ou, [o]ne, I have a weapon just in case you retaliate. Two, do not talk before, during or after my speech. I will leave after. No follow-up questions. I'm sure you probably know already but are you still curious as to why I hate you? First let me answer some questions. Do I hate you? Absolutely. Do I hope you die? No doubt about it. Do I love you? No way Jose. Why you may ask? I know your whole day is going to be ruined hopefully so let me tell you. This is a very simple reason for this actually. It's because you ruined my childhood. Me and one of my friends talked about what was happening and we found out cause I was very confused at first as to what was happening now for the past three years you've been molesting me in my sleep saying inappropriate things and honestly I'm tired of it. The reason I never said anything is because when I tried to tell someone, someone was always doing things or didn't answer my calls. Also because of mommy and [T.B.]. However, I never thought to tell you I knew until a couple of days ago. So I'm telling you. Why? Because I get anxiety before I sleep, not knowing whether or not—whether you are gonna abuse me again or I'm gonna wake up in time to make you leave. Sometimes I wake up too late. Sometimes I wake up on time to stop you, but I never know and epically now that you don't have work over night, I'm never safe. I

6

get panic attacks and they are not fun. It feels horrible and I have scratched my skin off because I feel hands always crawling over me and I don't want them but they just keep feeling like hands are crawling on me. So from now on, we will not speak to each other unless it's about money or mommy forces me to. Don't ask for hugs anymore. Don't stay in my room for more than a minute . . . unless mommy is there with, and stop sexually assaulting me from now on. I can't deal with it anyone. Also stop with I'm a person with good morals cause you aren't. Stop acting like the victim every time I'm mean to you because you aren't. Stop saying I love you to me cause I'm not gonna say it back anymore, and stop telling me what I can wear outside because, frankly, it's worse in my own home than what could ever happen to me outside. You are exactly the kind of person you kept warning me about. The ones who will do bad things. Every time you talked, I never took you seriously because you are just a kid. You have ruined my childhood and made me not want kids because if I do, how do I know this isn't happening to them. Also, if I do ever get married, you aren't invited. If I ever do have kids, you'll never see them for their own safety. As far as I'm concerned, you are nobody to me for the rest of my life. One last thing. I will continue to ask for money and things you can answer with yes or no. No questioning. I feel like it's almost compensation for you ruining my childhood. Okay. Bad bye. I hope you have the worst day. Wait. Also, I have witnesses like David. I have confidents like two of my friends and I've got a video recording. If you continue I will tell mommy and take this to the police. Thank you.

In response to R.D.'s text message, defendant apologized to her via text message and then called R.D. multiple times. When R.D. finally answered, defendant "was talking about lying and he tried to make me feel bad for some

7

things I said."  Further, he explained his actions towards R.D. as he was stressed because "my mom started a business and I was nice."

On July 24, 2020, R.D. disclosed to L.B. what defendant had done to her. L.B. was on her laptop for work on a Zoom call and R.D. waited for L.B. to finish before she told her anything.  After L.B. finished her Zoom call, R.D. told her that defendant had been "touching [her] inappropriately."  R.D. further told L.B. that "it was impacting [her] mental health" and that she was "scared all the time" and "having panic attacks."

Thereafter, L.B. spoke to defendant and asked her friend to record the call. The following exchange took place:

> [Defendant]: So, I touched [R.D.] inappropriately.
>
> [L.B.]: Oh, you touched her inappropriately.  Huh? How so?
>
> [Defendant]: Like, you have me on—like, I don't feel like—
>
> [L.B.]: I just got three more questions: How long have you been touching her?  How long has this happened? And when was the last time you touched her?  Answer my three questions.
>
> [Defendant]: How long has this been happening?
>
> [L.B.]: Yeah.
>
> [Defendant]: She would say it's been—

[L.B.]: Huh?

[Defendant]: Like, she would say it's been three years, but I'm sure that—that—

[L.B.]: I'm sorry?

[Defendant]: —she would say it's been—

[L.B.]: I—I can't hear you.

[Defendant]: Uh, the first two or whatever, the first year, I wasn't touching her. It was more like she kept, like, approaching me and I kept, like, backing off. And I don't know how it got to the point where—where it got to this—this point. It's only like the first, uh—I wouldn't have—I wouldn't have—I didn't touch her. I just was, um, like playing with her. I didn't touch her inappropriately. It was just like—like the advances were happening and I kind of, like, brushed them off and I tried not to pick them up as it was, just kept, like, you know, getting more and more aggressive and obvious like the nudity and things like that. I tried to ignore it. I tried to, you know, bypass it. I really didn't want to look at her that way. I kept trying, you know—

[L.B.]: I asked when was the first time; how long ago did this happen? It's a simple question.

[Defendant]: I would say—I would say it's been—

[L.B.]: Huh?

[Defendant]: I'd say it's only really been maybe a year ago.

[L.B.]: A year ago? Okay.

9

A-2484-22

[Defendant]: Yeah.

[L.B.]: Now, when was the last time you touched her?

[Defendant]: Uh, probably last week.

[L.B.]: Huh? When was the last time you touched her?

[Defendant]: Last week.

. . . .

[L.B.]: Why did you do it, [defendant]? Why did you do it? Why did you touch [R.D.]?

[Defendant]: I wasn't trying to but she—it—it just kept getting out of control.

[L.B.]: Beyond control.

[Defendant]: I kept pushing away like it just—I—I (inaudible).

[L.B.]: Are you saying it's [R.D.]'s fault to advance against you? Fuck you.

[Defendant]: No, no, no. I'm not saying that it's her fault. I'm saying that I was weak and I—I—I—she was confused. It was nothing that (inaudible).

After his phone conversation with L.B., defendant texted the following to her: "Please answer. I can't change it, but I wanted to make change for better. Please I still was trying to do right by them. I never did toward my boy or any other. Please believe me."

On July 24, 2020, Scotch Plains Police Officer Rolando Rodriguez obtained a report from L.B., who reported that R.D. disclosed that she had been sexually assaulted by her stepfather, defendant, for the past two years. The matter was then referred to the Union County Prosecutor's Office - Special Victims Unit. Scotch Plains Police Officers transported L.B. and R.D. to the Child Advocacy Center in Elizabeth.

On July 24, 2020, at approximately 9:15 p.m., R.D., then fifteen years old, provided a recorded statement to Detective Annie Coll in the Union County Prosecutor's Office Special Victims Unit. R.D. informed Detective Coll that she was sexually assaulted by defendant, from October 2018 until July 2020, when she was between thirteen and fifteen years old.

On July 24, 2020, L.B. provided a statement to Detective Coll. L.B. also gave consent for Detective Coll to take pictures of text messages from R.D.'s and L.B.'s phones. On July 25, 2020, a consensual intercept was approved by the Legal Chief of Investigations for the Union County Prosecutor's Office. On July 25, 2020, the consensual intercept was conducted at approximately 1:06 a.m. L.B. agreed to call defendant to engage in a conversation about what happened to R.D. During that phone call, the following interaction occurred:

> [L.B.]: . . . [w]here did you touch her?

[Defendant]: Hold on a second. Um, at the beginning it was just like the underwear. I didn't touch her directly, um. I tried to make a point not to.

[L.B.]: You just pulled her underwear? How did you touch her underwear? I'm not understanding.

[Defendant]: Um.

[L.B.]: When you say underwear, where in her underwear?

[Defendant]: Um, I—I do need to ask, are you—are you—are you, like, reporting me? Are you at the police right now or something?

[L.B.]: I'm asking you a question.

[Defendant]: I'm aware of that, but I—I'm asking you, can you just—can we have a private conversation? Can I not have other people involved?

[L.B.]: You're talking about the private of you touching [R.D.] in her private? 'Cause I need to know.

[Defendant]: (Inaudible) with you.

. . . .

[L.B.]: When you say underwear, what do you mean?

[Defendant]: Like—like—like a wedgie, I guess, (inaudible) started.

[L.B.]: So you gave her a wedgie?

[Defendant]: That was the thing, yeah, and um.

12

[L.B.]: So you touched her on her butt and gave her a wedgie?

. . . .

[L.B.]: Yeah, but you touched [R.D.]. Why? Why did you touch her? Why you, [defendant]? Why? Somebody I trusted. Why did you do it? Why?

[Defendant]: We've been going through so much and I—I broke down. I couldn't—

[L.B.]: You couldn't get a prostitute, [defendant]?

[Defendant]: I—a what?

[L.B.]: You couldn't get a prostitute or something? You had to get a child?

[Defendant]: I—I—

[L.B.]: My daughter?

[Defendant]: I couldn't—I couldn't even leave the house. You were leaving every weekend, every week, leaving me in the house with the kids.

[L.B.]: What the fuck.

[Defendant]: I was—I was stressed and there was so much going on even to this point, like, all of the fighting.

[L.B.]: So you touched her.

[Defendant]: I didn't—I didn't do it on purpose.

A-2484-22

On May 6, 2021, a Union County grand jury charged defendant with first-degree aggravated assault, N.J.S.A. 2C:14-2(a)(2)(a) (count one); third-degree aggravated sexual assault, N.J.S.A. 2C:14-3(a) (counts two and three); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) (counts four and five).

Pre-Trial Motions

On November 8, 2021, the State moved to admit defendant's statement under N.J.R.E. 104(c), N.J.R.E. 803(b)(1), and State v. Driver, 38 N.J. 255 (1962). The State also moved to admit fresh complaint evidence pursuant to N.J.R.E. 803(c)(2) and other acts evidence pursuant to a N.J.R.E. 404(b) or alternatively an intrinsic evidence analysis. On February 10, 2022, the court held a fresh complaint hearing, at which L.B. testified. Initially, L.B. asserted a Fifth Amendment privilege not to testify, but following an explanation from the court, L.B. agreed to testify.

On March 1, 2022, in a written opinion, the court granted the State's motion to admit defendant's statements "because all statement[s] offered by the State are relevant and do not merit exclusion pursuant to N.J.R.E. 403, the statements are admissible in the State's case-in-chief."

The court also allowed R.D.'s statement to L.B. to be admitted under the fresh complaint doctrine. The court noted that three elements have to be satisfied in order to admit a statement as fresh complaint evidence: (1) the person to whom the complaint was made is a natural confidante, (2) the statement must be spontaneous and voluntary, and (3) the statement must have been made within a reasonable time. The court found all three elements were satisfied.

As to the first element, the court elaborated, "[c]ertainly the first prong of N.J.R.E. 803(c)(2) . . . is satisfied as a mother inherently qualifies as a 'natural confidante' to a daughter." Regarding the second element, the court found "that R.D. initiated the conversation by approaching L.B." Finally, as to the third element, the court determined that "[g]iven the age of R.D. when the abuse allegedly began, coupled with the almost immediate disclosure upon the end of the abuse, R.D. disclosed within a reasonable time period.

The court also found that evidence of the last assault in New York was admissible in the State's case-in-chief, under N.J.R.E. 404(b), holding " the New York evidence" should be analyzed under "an intrinsic framework."

The Trial

On September 13, 2022, defendant's trial began and spanned four non-consecutive days. R.D. testified as to all the incidents that occurred in Irvington,

15

Newark, Scotch Plains, and New York. Further, for the first time during the State's direct examination of R.D., the State brought up R.D.'s disclosure to her friend "Regina" about what defendant had done to her. The defense declined to ask for a mistrial, the court issued a limiting instruction to the jury, and the parties agreed on a stipulation.

On September 13 and 14, 2022, L.B. testified for the State. On September 14, 2022, Sergeant Coll[2] testified for the State. Finally, on September 14, 2022 and September 15, 2022, defendant testified on his own behalf and the jury began deliberations. On September 20, 2022, the jury found defendant guilty on all counts.

On March 10, 2023, the court sentenced defendant. On count one, the court imposed a twelve-year period of incarceration, subject to NERA, Megan's Law registration, and PSL, along with appropriate fines and penalties. On counts two and three, the court imposed a four-year term of imprisonment, and on count four, the court imposed a seven-year term of imprisonment. The court ordered counts two, three and four to run concurrently to one another, but consecutively to count one. On count five, the court imposed a seven-year

---

[2] Sergeant Coll was promoted to sergeant from detective in January 2022.

sentence, and ordered it to run concurrently to count one and consecutively to counts two, three, and four. This appeal followed.

## II.

We review a trial court's evidentiary decision under a deferential standard. State v. Medina, 242 N.J. 397, 412 (2020). A trial court's decision "should be upheld 'absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" State v. J.A.C., 210 N.J. 281, 295 (2012) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). A trial court's application of "the proper legal standing in evaluating the admissibility of evidence," however, is reviewed de novo. State v. Trinidad, 241 N.J. 425, 448 (2020).

The fresh complaint doctrine is an exception to the hearsay rule, and while such exception is not recognized under the New Jersey Rules of Evidence, our Supreme Court has recognized fresh complaint evidence under its case law. State v. Hill, 121 N.J. 150, 165-66 (1990). The purpose of the fresh complaint evidence is "to prove only that the alleged victim complained, not to corroborate the victim's allegations concerning the crime." State v. R.E.B., 385 N.J. Super. 72, 89 (App. Div. 2006); State v. Bethune, 121 N.J. 137, 146 (1990). At trial, fresh complaint evidence serves a narrow purpose, to negate the inference that

17

the victim was not sexually assaulted because of her silence, and only the fact of the complaint itself is admissible. Hill, 121 N.J. at 163.

For the fresh complaint doctrine to apply, the proponent of the evidence must establish that: (1) the victim of the sexual assault disclosed the crime to a natural confidante, whom the victim would ordinarily turn to for support; (2) the disclosure was spontaneous and voluntary; and (3) the disclosure was made within a reasonable time after the alleged assault. Ibid. In determining whether a complaint was made within a reasonable time after the act(s) occurred, the duration between the incident(s) and the reporting does not bar the statement if explainable by the youth of the victim in light of the circumstances, such as being cajoled and coerced into remaining silent by their abusers. Bethune, 121 N.J. at 143. Child victims may be reluctant to talk about sexual assault, given their limited understanding of what was done to them. State v. P.H., 178 N.J. 378, 393 (2004).

Seminal cases related to the fresh complaint doctrine acknowledge that children may be too embarrassed and scared to discuss sexual abuse, making it necessary to be flexible in the application of the fresh complaint rule for children victims of sex crimes. Bethune, 121 N.J. at 143. "A substantial lapse of time between the assault and the complaint may be permissible if satisfactorily

explainable by the age of the victim and the circumstances surrounding the making of the complaint." State v. Pillar, 359 N.J. Super. 249, 281-82 (App. Div. 2003).

The length of the delay in making a disclosure does not impact the admissibility of the statement, but rather, the weight to be ascribed to the evidence. State v. Bethune, 232 N.J. Super. 532, 535 (App. Div. 1989). Accordingly, the timeliness of the complaint and any circumstances explaining the delay are questions for the jury. Id. at 537; See State v. Balles, 47 N.J. 331, 341 (1966).

Defendant argues that the third prong of reporting within a reasonable time was not met in this instance. Defendant states, "[h]ere, the victim waited over two years to come forward. There was no satisfactory explanation proffered for the delay."

Cases related to the fresh complaint doctrine have found up to three years between the sexual assault and disclosure to be reasonable. Where there are multiple instances of assault, the reasonableness of the timing of disclosure is measured from the last date of an assault. State v. W.B., 205 N.J. 588, 618 (2011). In W.B., the victim was attacked by her stepfather at age fourteen, and she later disclosed the incident at age sixteen. Ibid. Our Supreme Court

concluded that the timespan was reasonable for purposes of admitting fresh complaint testimony. Id. at 619.

Our Supreme Court reasoned the victim's age at the time of the disclosure, the victim living with defendant at least part of the time in between the attack and the disclosure, and the victim being scared to report the abuse, were all contributing factors that impacted the determination of reasonableness. Ibid.; see also R.E.B., 385 N.J. Super. at 88 (concluding that the victim's disclosure regarding repeated sexual assault incidents by her own father after two years was reasonable).

In its written opinion, the court stated the following about R.D's delay in reporting:

> Though defendant notes an arguable concern in R.D. delaying years after the initiation of the alleged abuse, New Jersey courts have relaxed the "reasonable time" requirement where the complainant is a child "in light of the reluctance of children to report a sexual assault and their limited understanding of what was done to them." W.B., 205 N.J. at 618. Here, R.D. was approximately thirteen when defendant allegedly began sexually abusing her. Abuse that allegedly lasted approximately three years as the final act of abuse took place in July of 2020. Though R.D. did not disclose until after the abuse ended, years later, she disclosed mere days after the final act of abuse. Given the age of R.D. when the abuse allegedly began, coupled with the almost immediate disclosure upon the end of the abuse, R.D. disclosed within a reasonable time period.

20

While the court acknowledges that though R.D. disclosed mere days after the final act of alleged abuse, years of alleged abuse passed by prior to this disclosure; this delay goes to weight, not admissibility of the statement. Certainly, given the quickness to disclose following the final act of alleged abuse, it would be inappropriate to deem the statement inadmissible under the guise of some delay to disclose. Despite that, the court is cognizant that defendant may have qualms with the fact that R.D. delayed years prior to making any disclosure. This concern, however, does not affect the court's ruling for admission as it is more appropriately placed in the province of defendant to argue against the weight before the jury.

In sum, the court found that R.D.'s disclosure to L.B. occurred after a reasonable period of time because it was mere days after the last incident and was less than two years after the first incident. We also find the timing of R.D's disclosure to L.B. was temporally proximate enough to be regarded as still "fresh" based upon our review of the record.

Further, defendant also argues that L.B.'s statement to Detective Coll was tainted because, "[L.B.] indicated that she did not remember what exactly had been stated when [R.D.] advised her of the alleged sexual abuse. [Detective Coll] then gave her information from her interview with R.D. Only then was L.B. able to recall what occurred during that crucial conversation."

However, defendant's contention is contradicted by the record. During her interview, L.B. stated the following:

21

I had a [Z]oom today with um . . . my sister in success it was a long [two][-]hour Zoom, from 12:30 to a little after 2:30, 2:40 you know, [R.D.] asked if she could, you know tell me something, and I'm just like, hey I have [Z]ooms back to back, so she just laid behind the computer, you know as I was doing the previous [Z]oom, you know, and then um . . . when I was finished with that um . . . conference call, one of my business partners um . . . she was like, you know can she talk to me? I was like, can you make it quick, 'cause I have, you know back[-]to[-]back [Z]ooms all day. She asked can I put the laptop down. I'm like, [R.D.] what is it? She said it was about her mental health, and then she broke down and cried, I put my laptop down,' cause I . . . I thought she was gonna talk to me about BTS or something, 'cause sometimes . . .

. . . .

She was like, it's about dad, I'm like what about him? He has been touching me inappropriately and I grabbed her, she was crying, um . . . yeah I grabbed her, she was crying and that's it, like the next move, the next move was to like, you know to (INAUDIBLE) people, I will not be available today.

This statement was made at the beginning of the interview from L.B. to Detective Coll before L.B. had seen any portion of the interview with R.D. Therefore, the court's decision to admit L.B. as a fresh complaint witness pursuant to N.J.R.E. 803(c)(2) was correct as it was done in a reasonable time period and was not tainted.

III.

Defendant next argues that L.B. was coerced to testify by both the State and the court. According to defendant, the State's threat to file a material witness complaint against L.B. reinforced the "coercive actions" taken by the court. Defendant avers L.B. did not want to get incarcerated and did not want to return on another day to testify, but at the same time, her reluctance to testify was evident. Defendant claims that L.B. agreed to cooperate and testify only after "pressure" was asserted by the State and court. We are unpersuaded.

Our Supreme Court has held the following with regard to a witness refusing to testify:

> A court can hold a witness in civil contempt for refusing to testify and incarcerate that witness until such time as he purges himself of the contempt by testifying. In re Daniels, 118 N.J. 51, 59 (1990). Incarceration under civil contempt can last no longer than the life of the proceedings. See id. at 60.
>
> The court also has the power to hold a recalcitrant witness in criminal contempt. N.J.S.A. 2C:1-5(c) ("This section does not affect the power to punish for contempt, either summarily or after indictment, or to employ any sanction authorized by law for the enforcement of an order or a civil judgment or decree."); N.J.S.A. 2C:29-9(a) ("A person is guilty of a crime of the fourth degree if he purposely or knowingly disobeys a judicial order or protective order, . . . or hinders, obstructs or impedes the effectuation of a judicial order or the exercise of jurisdiction over any

23

person, thing or controversy by a court, administrative body or investigative entity.").

[State v. Byrd, 198 N.J. 319, 330 (2009).]

Further, N.J.S.A. 2A:81-17.3 provides:

In any criminal proceeding before a court or grand jury, if a person refuses to answer a question or produce evidence of any other kind on the ground that he [or she] may be incriminated thereby and if the Attorney General or the county prosecutor with the approval of the Attorney General, in writing, requests the court to order that person to answer the question or produce the evidence, the court shall so order and that person shall comply with the order. After complying and if but for this section, he [or she] would have been privileged to withhold the answer given or the evidence produced by him [or her], such testimony or evidence, or any information directly or indirectly derived from such testimony or evidence, may not be used against the person in any proceeding or prosecution for a crime or offense concerning which he [or she] gave answer or produced evidence under court order. However, he [or she] may nevertheless be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing or contempt committed in answering, or failing to answer, or in producing, or failing to produce, evidence in accordance with the order. If a person refuses to testify after being granted immunity from prosecution and after being ordered to testify as aforesaid, he [or she] may be adjudged in contempt and committed to the county jail until such time as he [or she] purges himself [or herself] of contempt by testifying as ordered without regard to the expiration of the grand jury; provided, however, that if the grand jury before which he [or she] was ordered to testify has been dissolved, he

24

[or she] may then purge himself by testifying before the court.

Here, we discern no error. The record establishes that at the N.J.R.E. 104 hearing, L.B. asserted her Fifth Amendment privilege not to testify. The court stated:

> But . . . as a witness in this case you don't really have the right to drop the case. This is the S[tate] [of] N[ew] J[ersey] [vs.] [defendant], not [L.B.], versus [L.B.]. And it's . . . not an option for you to exercise here. Now the right for you to testify is a little different. You can certainly say I refuse to answer any questions. But if you refuse to answer any questions then you have to be more concerned about [the court]. And the—unless there is a privilege, whether it's constitutional, or embodied in case law, or court rule or evidence rule, [t]he [c]ourt can order you to testify, and if you refuse to testify, [t]he [c]ourt sometimes resorts to its most serious remedy, which is to incarcerate somebody for contempt until they agree to testify.
>
> . . . .
>
> But you don't—[the court is] trying to be very respectful to you, [L.B.]. There are—you know, only you can make this decision. Certainly you may have your own reasons. [The court is] not going to ask you what your reasons are for not wanting to testify, but [the court is] fairly confident an attorney is going to advise you in the same manner that [the court] advised you, and you could be back here after having spent, you know, considerable money retaining an attorney, having to come back for multiple proceedings before [the court], and still having to testify in the final analysis.

25

There is nothing you have indicated to me which would allow you not to testify in this case. And given the nature of this case—there are some cases where if—though if a witness is the only witness the State has the State can dismiss it. Sometimes, though, even if they only have one witness they will have that witness detained until such time as they take the stand, and even if you refuse to testify on the stand, there are steps they can take to admit your earlier testimony. It can be a very in—involved, drawn-out, long procedure, and [the court is] just going to ask you one more time, do you—do you want time to talk to an attorney? Would you like to take [ten] minutes to simply think about it? What is your preference here today? [The court] can assure you that if you decide to go get an attorney you will be back here in this court at least once, maybe several times.

LB: Okay, we can move forward.

The court did not abuse its discretion. Our review of the record convinces us neither the State nor the court coerced L.B. to testify. L.B. maintained she was asserting the Fifth Amendment privilege not to testify. The court properly informed L.B. it could hold her in contempt or that the State could file a material witness complaint, which is precisely what is authorized by N.J.S.A. 2A:81-17.3. Therefore, we reject defendant's claim of prosecutorial and judicial misconduct.

## IV.

Next, defendant asserts the court erred in permitting N.J.R.E. 404(b) evidence pertaining to alleged sexual abuse during the family's New York camping trip.  The State counters the evidence was properly admissible under the four prongs of State v. Cofield, 127 N.J. 328 (1992), as well as intrinsic to the crimes charged.

### A.

### Cofield Analysis

Under N.J.R.E. 404(b), evidence of "other crimes, wrongs, or acts" is inadmissible as evidence of a person's bad character or criminal predisposition; however, such evidence is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute."  N.J.R.E. 404(b); see State v. Stevens, 115 N.J. 289, 300-01 (1989).  In order to justify admission, the evidence must (1) "be admissible as relevant to a material issue"; (2) "be similar in kind and reasonably close in time to the offense charged"; (3) "be clear and convincing" evidence of the other crime or bad act; and (4) have probative value that is not "outweighed by its apparent prejudice."  Cofield, 127 N.J. at 338 (citation omitted).

In its written opinion from On March 1, 2022, the court did a full analysis of the evidence under each of the four factors from Cofield, which we will address in turn.

## Prong One

The first Cofield prong requires the evidence be "relevant to a material issue genuinely in dispute," ibid., which only requires the offering party to establish that "the evidence makes a desired inference more probable than it would be if the evidence were not admitted." State v. Garrison, 228 N.J. 182, 195 (2017) (quoting State v. Williams, 190 N.J. 114, 123 (2007)). "The mere bolstering of a witness's credibility does not satisfy the relevancy element of the Cofield test." State v. Prall, 231 N.J. 567, 582 (2018).

Regarding prong one, the court here explained:

> Further, though not raised by the State, the court recognizes the argument that the New York alleged conduct is relevant as it speaks to R.D.'s credibility. R.D. disclosed defendant's conduct approximately two days after the New York conduct. Accordingly, evidence of the New York conduct could be utilized to express why R.D. chose to disclose immediately thereafter. As such, the evidence is relevant because it explains R.D.'s conduct and, given the proximity to the disclosure to L.B., minimizes risk of confusion in the timing of events. Accordingly, the court finds the New York evidence relevant for this purpose and analyzes it below under an intrinsic evidence framework.

In sum, the New York evidence is relevant to and probative of R.D.'s credibility.

While evidence of defendant's bad acts makes the "desired inference" that he sexually assaulted R.D. "more probable," Garrison, 228 N.J. at 195, the evidence bolstered R.D.'s credibility that defendant sexually assaulted her because the New York incident led R.D. to tell L.B. about the abuse, after which the police launched an investigation into the allegations. More importantly to this analysis, the evidence tends to prove defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." N.J.R.E. 404(b).

## Prong Two

The second factor of the Cofield test "requires that the 'other acts' be 'similar in kind and reasonably close in time to the offense charged.'" State v. Green, 236 N.J. 71, 83 (2018) (quoting Cofield, 127 N.J. at 338). However, that factor is "limited to cases that replicate the circumstances in Cofield." Williams, 190 N.J. at 131; see also Cofield, 127 N.J. at 328 (holding a past conviction of conspiracy to distribute drugs was admissible in a subsequent case for conspiracy, unlawful possession and unlawful possession with intent to distribute).

With regard to prong two, the court reasoned:

29

Here, as stated prior, the alleged acts in New York took place mere days after the last act of sexual contact contained in the New Jersey complaint.  Further, the State argues and the [d]efense agrees that there can be no doubt that the conduct occurred close in time and involved the same type of behavior.  Moreover, the conduct is of similar kind as it exists as part of a continuing course of sexual conduct.

Prong two is clearly met in this instance as the acts occurred so close in time to one another, while also being indistinguishable from the previous assaults committed by defendant against R.D.

Prong Three

"Under the third <u>Cofield</u> prong, the prosecution must establish that the other crime 'actually happened by clear and convincing evidence.'"  <u>Green</u>, 236 N.J. at 83 (quoting <u>State v. Rose</u>, 206 N.J. 141, 160 (2011)) (internal quotation marks omitted).  This has been done by showing a judgment of conviction, <u>ibid.</u>, by the act not being disputed at trial, <u>Garrison</u>, 228 N.J. at 197, or, when a <u>Cofield</u> hearing is not held, by the circumstances and documentation adequately supporting the assertion, <u>Rose</u>, 206 N.J. 163-64.

In analyzing prong three, the court held:

Here, the State argues that they meet their burden to prove the New York conduct by clear and convincing evidence though the sworn statement of R.D., and if required, in-court testimony.  Further, the State argues that because R.D, will testify at trial, incompetent

30

> hearsay will not form the basis of satisfying the burden of proof required. Defen[dant], however, argues that the court should hear the testimony prior to ruling as currently the only evidence in existence is hearsay. Accordingly, this court will not rule on the merits of this prong until hearing testimony sufficient to satisfy the State's burden of clear and convincing evidence.

Although the court reserved decision on prong three, R.D.'s testimony provided a clear and convincing portrayal of the events that took place on the New York camping trip, and was considered by the jury. Therefore, we conclude there was no abuse of discretion or error.

### Prong Four

Finally, the fourth Cofield prong requires the court to determine "whether the probative value of the evidence is outweighed by its apparent prejudice— 'generally the most difficult part of the test.'" Garrison, 228 N.J. at 197 (quoting State v. Barden, 195 N.J. 375, 389 (2008)). "That prong requires an inquiry distinct from the familiar balancing required under N.J.R.E. 403: the trial court must determine only whether the probative value . . . is outweighed by its potential for undue prejudice, not whether it is substantially outweighed by that potential as in the application of [N.J.R.E.] 403." Green, 236 N.J. at 83-84 (citation omitted).

"Given the 'inflammatory characteristic of other-crime evidence[,]' the trial court must conduct a 'careful and pragmatic evaluation . . . to determine whether the probative worth of the [other-crime] evidence outweighs its potential for undue prejudice.'" State v. J.M., 225 N.J. 146, 161 (2016) (alterations in original) (quoting State v. Willis, 225 N.J. 85, 100 (2016)) (holding that prejudicial effect of evidence of another sexual assault outweighed the probative value).

Regarding prong four, the court found:

> Here, the State argues that there is no less inflammatory evidence and therefore the New York conduct is necessary as it is relevant to a non-propensity purpose. Further, the State argues that the probative value is not significantly outweighed by the inflammatory potential and prejudice to defendant. The court agrees. The New York evidence, as noted above, is relevant as it relates to R.D.'s credibility. Specifically, R.D. claims she was last touched by defendant in New York two days before she disclosed to her mother, L.B. Depending on how questioning at trial develops, a gap may be apparent in the testimony. This runs the risk of needlessly confusing the jury. Further, when weighed against potential prejudice to defendant, the court finds that any prejudice does not outweigh the probative value of the New York evidence. It is alleged that defendant sexually assaulted R.D. over a period of years in New Jersey. Additional evidence regarding one out-of-state allegation that is not more egregious in nature does not tip the scale.

The court correctly considered that this evidence was admissible because of its relevance to the timeline of events. Given the assaults occurred over a period of time, testimony about the New York assault was not unduly prejudicial to defendant.

B.

Intrinsic Evidence

Even if evidence constitutes "uncharged misconduct that would normally fall under [N.J.R.E.] 404(b)," if it is "intrinsic to the charged crime [it] is exempt from the strictures of [N.J.R.E.] 404(b) . . . because it is not evidence of other crimes, wrongs, or acts." Rose, 206 N.J. at 177 (citation and internal quotation marks omitted). Rather, intrinsic evidence need only satisfy the N.J.R.E. 403 balancing test and the relevancy evidence rules. Id. at 177-78.

To determine if evidence is "intrinsic," our Supreme Court adopted the test articulated in United States v. Green, 617 F.3d 233, 248 (3d Cir. 2010), which limits intrinsic evidence to "two narrow categories of evidence." Rose, 206 N.J. at 180; State v. Brockington, 439 N.J. Super. 311, 327 (App. Div. 2015). "The first category applies to evidence that 'directly proves' the charged offense," and the "operative factor is whether the evidence has probative value as to the charged offense." Brockington, 439 N.J. Super. at 327 (quoting Rose,

206 N.J. at 180). The second category defines intrinsic evidence as "uncharged acts performed contemporaneously with the charged crime [that] . . . facilitate the commission of the charged crime." Rose, 206 N.J. at 180.

If the evidence is intrinsic, then under N.J.R.E. 403, "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury; or (b) undue delay, waste of time, or needless presentation of cumulative evidence." N.J.R.E. 403. "The party seeking the exclusion of the evidence must demonstrate that one or more of the factors listed in [N.J.R.E.] 403 substantially outweighs the probative value of the evidence." Griffin v. City of E. Orange, 225 N.J. 400, 420 (2016); see N.J.R.E. 403.

When the [N.J.R.E.] 403 factor invoked is the risk of "undue prejudice," "the question is not whether the challenged testimony will be prejudicial to the objecting party, 'but whether it will be unfairly so.'" Id. at 421 (quoting Stigliano by Stigliano v. Connaught Labs., Inc., 140 N.J. 305, 317 (1995)); see N.J.R.E. 403; see also State v. Santamaria, 236 N.J. 390, 410 (2019) ("[I]f evidence is found to be intrinsic to the crime at issue, it does not constitute other-acts evidence and is subject only to the limits of [N.J.R.E.] 403").

In its analysis of whether the New York assault fell under the intrinsic evidence of the charged crimes, the court stated:

> Here, the State argues that defendant's sexual contact with R.D. in New York constitutes intrinsic evidence because it is contemporaneous to the charged offenses in New Jersey, and alternatively, is necessary background information. The court agrees. Specifically, the timeline lends itself to the conclusion that the New York conduct is inherently intrinsic to the charged conduct. Defendant's last sexual contact with R.D. was on July 13, 2020, in New Jersey and July 20, 2020, in New York. Following the July 20, 2020, New York conduct, R.D. confronted defendant via text two days later on July 22, 2020. Finally, R.D. disclosed the sexual assaults to her mother, L.B. on July 24, 2020. The mere proximity of the New York sexual contact to the ultimate disclosure to L.B. supports a finding that the New York conduct was contemporaneous to the charged acts of aggravated sexual contact in New Jersey.
>
> Further, the State contends that the admission of the New York evidence overcomes a N.J.R.E. 403 balancing test. For the same reasons aforementioned in prong four of the Cofield test, the court agrees. As such, while the court finds that the evidence is admissible pursuant to N.J.R.E. 404(b); the court finds that the New York evidence is more appropriately considered under an intrinsic framework. In sum, the court finds that for the reasons aforementioned, the evidence is intrinsic and therefore admissible in the State's case-in-chief.

The court was correct in its analysis. The conduct in New York occurred contemporaneously with the charged crimes. Further, the New York incident

35

was also necessary background information to the charged crimes and, it was highly probative and outweighed any unfair prejudice under N.J.R.E. 403 as the conduct helped explain why R.D. finally went to L.B. and told her that defendant had been sexually assaulting her. Thus, because the New York incident was intrinsic to the charged crimes and because it was also admissible pursuant to N.J.R.E. 404(b), we discern no error or abuse of discretion.

## V.

Defendant next argues that when R.D. testified and she brought up how she had told her friend Regina about what happened, the court should have granted a mistrial sua sponte.

During R.D.'s testimony, the following exchange occurred:

> [State]: Is that—in Irvington, was that the first time he touched you?
>
> [R.D.]: Yes.
>
> [State]: And so you said you were in the bunk bed and you said you told somebody, you texted somebody?
>
> [R.D.]: Yes.
>
> [State]: Do you remember who that was?
>
> [R.D.]: My friend at the time.
>
> [State]: Who was that?

36

[R.D.]: [Regina].

[State]: And who was [Regina]—I mean, I know you said she was a friend, but did you know [Regina] in person?

[R.D.]: No.

[State]: How—how did you meet her?

[R.D.]: We both liked BTS. At the time, it was an app.

[State]: What's BTS?

[R.D.]: It's a group.

[State]: Is that a pop sensation, BTS?

[R.D.]: Yeah.

[State]: And is that—is it a boy band?

[R.D.]: Yes.

[State]: Okay. And you met [Regina] through that app?

[R.D.]: Yes.

[State]: Did you—did you ever—I want to come back to [Regina] but.

[Defendant's attorney]: Can we be seen at sidebar?

[The court]: Yes.

Later on the same day of the trial, after counsel conferenced with the court, the following curative instruction was given to the jury:

Ladies and gentlemen, before we continue, I just wanted to address matters with you. One has to do with a stipulation the parties had entered. A stipulation is an agreement by the parties as to a fact. It is—since it is agreed upon by the parties, what that means is no testimony needs to be produced on that subject. You can accept the stipulation as if those facts have been agreed upon by the parties. You're free to ignore the stipulation or reject the stipulation, but the parties have agreed that those facts are true.

You've heard limited testimony to a person named [Regina]. When R.D. was interviewed by [Detective] . . . Coll, she was unable to provide the contact number for [Regina], text messages from [Regina], or any chat conversations from the app on which the communications occurred. None have been provided to date.

"The grant of a mistrial is an extraordinary remedy . . . ." State v. Yough, 208 N.J. 385, 397 (2011). Motions for mistrial are "addressed to the sound discretion of the [trial] court; and the denial of the motion is reviewable only for an abuse of discretion." State v. Herbert, 457 N.J. Super. 490, 503 (App. Div. 2019) (quoting State v. Winter, 96 N.J. 640, 646-47 (1984)). Therefore, this court will not disturb the trial court's decision absent a "manifest injustice." State v. Smith, 224 N.J. 36, 47 (2016). Whether the alleged error can be ameliorated by a curative instruction is a part of that discretion:

The decision on whether inadmissible evidence is of such a nature as to be susceptible of being cured by a cautionary or limiting instruction, or instead requires

38

the more severe response of a mistrial, is one that is peculiarly within the competence of the trial judge, who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting.

[Winter, 96 N.J. at 646-47.]

The same deference applies to the curative instruction given in lieu of a mistrial. Id. at 647.

The decision to opt for a curative instruction instead of a mistrial depends on three factors: "the nature of the inadmissible evidence the jury heard, and its prejudicial effect," whether the instruction was given in a timely fashion, and whether the evidence created a real possibility that it "led the jury to a result it otherwise might not have reached." Herbert, 457 N.J. Super. at 505-07.

In the matter under review, evidence that R.D. told her friend Regina about defendant touching her was an isolated event and not tied to any of the other evidence introduced at trial. The court immediately gave a curative instruction. Moreover, the nature of the evidence cannot be said to have led the jury to a result it otherwise might not have reached. Therefore, we are satisfied the court did not abuse its discretion by choosing a curative instruction over a mistrial.

## VI.

Defendant also contends if any of the complained errors in Points II through V are insufficient to warrant reversal, the cumulative effect of those errors denied him due process and a fair trial. He claims the effect of various errors compromised his ability to present a defense warranting a new trial.

A defendant is entitled to a fair trial, but not a perfect one. State v. Marshall, 123 N.J. 1, 169-70 (1991). It is well recognized that incidental legal errors, which creep into a trial but do not prejudice the rights of a party or make the proceedings unfair, may not be invoked to upset an otherwise valid verdict. State v. Orecchio, 16 N.J. 125, 129 (1954). Courts have recognized that even when an individual error does not constitute reversible error, a series of such errors, considered in combination, can have a cumulative effect that casts sufficient doubt on a verdict to require reversal. State v. Koskovich, 168 N.J. 448, 540 (2001). The cumulative error doctrine requires the granting of a new trial before an impartial jury when legal errors are either of such a magnitude that defendant has been prejudiced or have in the aggregate rendered the trial unfair. Ibid.

When a defendant raises a claim of cumulative error, the court must assess whether the defendant received a fair trial by considering "the impact of the trial

error on defendant's ability to present a defense, and not just excuse error because of the strength of the State's case." State v. Jenewicz, 193 N.J. 440, 473 (2008). Indeed, "even when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal." Ibid.

We conclude none of defendant's arguments on appeal, reviewed individually or collectively, constituted cumulative error to render the underlying trial unfair. Wakefield, 190 N.J. at 538. Therefore, defendant has failed to establish a basis to overturn his trial convictions.

## VII.

Lastly, we address defendant's excessive sentencing argument. At the sentencing hearing, the court found aggravating factor one, N.J.S.A. 2C:44-1(a)(1) (the nature and circumstances of the offense); two, N.J.S.A. 2C 44-1(a)(2) (the gravity and seriousness of harm inflicted on the victim); three, N.J.S.A. 2C 44-1(a)(3) (the risk that defendant will commit another offense); and nine, N.J.S.A. 2C:44-1(a)(9) (general and specific deterrence). The court rejected mitigating factor eight, N.J.S.A. 2C: 44-1(b)(8) (defendant's conduct was the result of circumstances unlikely to recur). The court found mitigating factor seven, N.J.S.A. 2C:44-1(b)(7) (defendant has no history of prior

41

delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense) did apply.

Defendant challenges the court's assessment of aggravating factors one, two, three, and nine. In particular, defendant contends his behavior was not heinous, cruel, or depraved; R.D. did not sustain any physical harm; and she presented no proof of lasting psychological harm. Defendant argues there is little specific deterrence in this case, and the court abused its discretion by rejecting mitigating factor eight. Defendant's contentions are unavailing.

Sentencing determinations are reviewed on appeal with a highly deferential standard. State v. Fuentes, 217 N.J. 57, 70 (2014). "The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'" Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

Once the trial court has balanced the aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and (b), it "may impose a term within the permissible range for the offense." State v. Bieniek, 200 N.J. 601, 608 (2010);

see also State v. Case, 220 N.J. 49, 65 (2014) (instructing that appellate courts

may not substitute their judgment for that of the sentencing court, provided that

the "aggravating and mitigating factors are identified [and] supported by

competent, credible evidence in the record").

With regard to aggravating factors one and two, the court stated,

> However, when [the court] look[s] at [c]ounts [two], [three], [four], and—excuse [the court]—[two], [three], and [four], those are all completely separate counts, uh, separate acts than [c]ount [one]. And they were extensive, they were pervasive, and they had a huge impact on R.D.
>
> When [the court] look[s] at those, in addition to the [t]hree and [n]ine [a]ggravating [f]actors [the court] found earlier, [the court] would add in [o]ne and [t]wo, just because of the repeat number of instances that occurred in . . . those cases. And it—it—even before [the court] talk[s] about what sentence it would impose, [the court] just think[s] that, uh, in looking at the [State v. Yarbough, 100 N.J. 627 (1985)] factors . . . it started off, [n]umber [one], there should be no free crimes.

As to aggravating factors three and nine and mitigating factor seven, the

court stated,

> Certainly on [c]ount [one] [the court] find[s] that [a]ggravating [f]actors [three] and [nine] apply. [The court] agree[s] that there is a risk that . . . defendant will commit another offense. And despite what the . . . Avenel [r]eport indicated, when . . . you have testimony of this nature as to the regularity with which it happened, uh, it would be—the [c]ourt would be hard-

43

pressed to come up with any understanding how you would ever let R.D. in the same room or let [defendant] in the room with any young woman, any—especially a young child, uh, without fear that he would do it again. It would be a natural reaction.

No, he should never be around and [the court would] be surprised if even [defendant's attorney] would argue that, uh, he should be trusted with any child alone at night, uh, who is—let's say [ten] years old.  Uh, it's clear, that would be a ridiculously dangerous thing to do.  There is a risk that he would commit that offense, and there is the need to . . . to deter others.

. . . [O]n the [m]itigating side on that, [s]even clearly applies.  He has no prior record.  Number [eight], [the court] can't go along with [e]ight because of [the court's] finding on [t]hree. . . . [I]t may be that [defendant] will not have a child again of this age, but if he were ever around a child of somebody else, [the court is] not sure that this would be a circumstance that would be unlikely to occur.

The record amply supports the court's finding that aggravating factors one and two applied to counts two, three and four.  The acts were "heinous, cruel or depraved" and defendant engaged in extensive, pervasive conduct that had a horrific impact on R.D. often in the sanctity of her home.  Further, the court also properly found that aggravating factors three and nine applied to count one.  The risk that defendant would commit this offense against others remains particularly high due to the number of times he assaulted R.D.  Moreover, the

44

court emphasized the need to deter others from committing this type of conduct, which was a proper analysis of factor nine. Therefore, we discern no reason to disturb the court's findings on the aggravating and mitigating factors.

Defendant also argues the court misapplied Yarbough and abused its discretion by running the sentences consecutively. He asserts, "the crimes occurred over a period of time, but were not independent of one another or had separate goals. The crimes did not involve violence or different victims. And there were not numerous crimes; three of the counts charged the same crime but in different towns."

N.J.S.A. 2C:44-5(a) provides that, when multiple sentences are imposed, these sentences "shall run concurrently or consecutively as the court determined at the time of sentence." There is "no overall outer limit on the cumulation of consecutive sentences for multiple offenses." Ibid. "[T]here is no presumption in favor of concurrent sentences and therefore the maximum potential sentence authorized by the jury verdict is the aggregate of sentences for multiple convictions." State v. Abdullah, 184 N.J. 497, 513-14 (2005).

Yarbough, requires that these criteria be considered "when sentence is pronounced on one occasion on an offender who has engaged in a pattern of

behavior constituting a series of separate offenses or committed multiple offenses in separate, unrelated episodes":

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence shall be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>> (a) the crimes and their objectives were predominantly independent of each other;
>>
>> (b) the crimes involved separate acts of violence or threats of violence;
>>
>> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>>
>> (d) any of the crimes involved multiple victims;
>>
>> (e) the convictions for which the sentences are to be imposed are numerous.
>
> (4) there should be no double counting of aggravating factors; [and]
>
> (5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense . . . .
>
> [Yarbough, 100 N.J. at 643-44.]

The "no free crimes" guideline stated in Yarbough factor one "does not require the court automatically to impose consecutive sentences for multiple offenses." State v. Rogers, 124 N.J. 113, 121 (1991). Instead, the sentencing court must consider all the Yarbough guidelines, with emphasis on the subparts of the third guideline. Ibid. These criteria should be applied qualitatively, not quantitatively, and consecutive sentences may be imposed even when a majority of the subparts support concurrent sentences. State v. Carey, 168 N.J. 413, 427 (2001).

If a sentencing court fully evaluates the Yarbough factors, its decision will not usually be disturbed on appeal. State v. Miller, 205 N.J. 109, 129 (2011). However, remand may be needed if a court does not sufficiently explain why consecutive sentences are warranted. Id. at 129-30; Carey, 168 N.J. at 424. Additionally, "the sentencing court's explanation of its evaluation of the fairness of the overall sentence is 'a necessary feature in any Yarbough analysis.'" State v. Torres, 246 N.J. 246, 270 (2021) (quoting State v. Cuff, 239 N.J. 321, 352 (2019)). Nevertheless, remand is unnecessary if the record "makes it possible to 'readily deduce' the judge's reasoning." Miller, 205 N.J. at 129 (quoting Bieniek, 200 N.J. at 609).

In its assessment of the <u>Yarbough</u> factors, the court expressly stated,

> When [the court] look[s] at those, in addition to the [t]hree and [n]ine [a]ggravating [f]actors [the court] found earlier, [the court] would add in [o]ne and [t]wo, just because of the repeat number of instances that occurred in . . . those cases. And it—it—even before [the court] talk[s] about what sentence. . . . [I]n looking at the <u>Yarbough</u> factors . . . it started off, [n]umber [one], there should be no free crimes.
>
> If [the court] were not to give a consecutive on this many other criminal acts, these would be . . . free crimes. [The court is] going to run them all concurrent to one another, uh, so it's—there's no extension, . . . , no double-counting there.
>
> . . . [c]ount [two]—the reasons [the court is] imposing this sentence as a consecutive sentence are—are simple. It's—the first count has to do with one act of penetration that has its own separate penalties, but then there was years of abuse testified to by the child on [c]ounts [two], [three], and [four] that justifies why that has to be a consecutive sentence.
>
> . . . [I]n looking at the third factor under <u>Yarbough</u>, . . . [three](a), the crimes and their objectives were predominantly independent. There—there—in any sex abuse case there is that tie. There is the relationship that exits, there's that similarity. . . . [B]ut they're nonetheless separate of this—each time it did not . . . treat them as one whole event would be inappropriate in this [c]ourt's estimation.
>
> They were clearly committed at different times, sometimes here in different places, regardless of where they moved, they continued to occur. . . . [I]t was only

one victim, but because of the number of times, [the court] think[s] the consecutive sentence is appropriate.

. . . [The court] do[es] not believe there is any double-counting of the [a]ggravating [f]actors by doing so in this particular case, given the singular nature of the aggravated sexual assault under [c]ount [one].

. . . [W]hen [the court] look[s] at the . . . overall sentence that is being imposed . . . . [t]here's no stacking . . . .

. . . .

Consequently, for [c]ounts [two] and [three], . . . for [c]ount [two], . . . it will be [four] years; [c]ount [three] will be [four] years; [c]ount [four] will be [seven] years. . . . [T]hey are all concurrent to one another and consecutive to [c]ounts [one] and [five].

Count [five], a [seven]-year term that is, . . . [the court] went with the mid[-]range on all of these based upon the balancing of the nature and circumstances of the offense, the risk he'll commit another offense, and the need to deter. Taking into account his . . . lack of a record as the mitigating [factor] as indicated previously.

The court properly considered the <u>Yarbough</u> factors and complied with <u>Torres</u>. The court did not violate the sentencing guidelines, there was competent and credible evidence to support the aggravating and mitigating factors, and the sentence does not shock the judicial conscience.

49

We conclude the remaining arguments—to the extent we have not addressed them—lack sufficient merit to warrant any further discussion. R. 2:11-3(e)(2)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2484-22