895 A.2d 1224 (2006)
385 N.J. Super. 72
STATE of New Jersey, Plaintiff-Respondent,
v.
R.E.B., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted March 28, 2006.
Decided April 27, 2006.
*1226 Stefankiewicz & Barnes, attorney for appellant (David A. Stefankiewicz, on the brief).
Zulima V. Farber, Attorney General, attorney for respondent (Steven A. Yomtov, Deputy Attorney General, of counsel and on the brief).
Before Judges LEFELT, HOENS and R.B. COLEMAN.
The opinion of the court was delivered by
LEFELT, J.A.D.
Defendant R.E.B. is serving a ten year term of imprisonment after being convicted of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4a, and first-degree aggravated sexual assault, N.J.S.A. 2C:14-2a, against his biological daughter, J.B., who was approximately thirteen or fourteen years old at the time of the alleged abuse. In a brief, which was unnecessarily lengthy, defendant advances ten errors allegedly committed by the trial court during defendant's Cape May County jury trial.[1] The excessively wordy and repetitive 104 page "brief" made it more difficult for us to discern whether defendant was advancing any meritorious allegations.[2] After our careful review of *1227 the record, however, we conclude that several errors were made that require reversal of defendant's conviction and a new trial. We deal only with those errors, which include the preclusion of admissible evidence and the absence of an instruction regarding the appropriate use of fresh complaint evidence.

I.
The pertinent facts are as follows. Defendant and J.B.'s mother divorced in 1990. In 1993, when J.B. was eight years old, she was, unfortunately, molested by her paternal grandmother's husband who was subsequently convicted of these crimes. J.B. stopped visiting with her father during this period, but resumed visitation approximately one year later in the fall of 1994.
After contact with her father resumed, J.B. and her brother R.B.III, who was eighteen months younger than his sister, generally had overnight visitation on weekends with their father and his current wife. It was during the overnight visitation at her father's house that J.B. asserts she was once again molested, this time by her own father.
She could not recall precisely when the incidents occurred or exactly when they stopped, but it was believed that they occurred sometime between 1998 and 2000. J.B. reported that the incidents occurred in the mornings, while her brother and defendant's wife were at the store and J.B. and defendant were alone in the house.
J.B. testified that in the morning defendant would come into the bedroom she shared with her brother, while she was alone watching television or listening to music. Defendant would lock the bedroom door and then proceed to have sex with her for about one hour. J.B. testified that defendant would touch her chest and, put his penis inside of her, ejaculating on her stomach. J.B. would wipe the ejaculate off of her stomach and then get dressed.
According to J.B., neither she nor defendant said anything to each other during the encounters and J.B. did not tell defendant to stop. J.B. testified that on one occasion defendant's wife came home while defendant was still in J.B.'s bedroom. The wife knocked on the door, and defendant told her to "hold on." Defendant dressed and left the room, explaining to his wife that he was helping J.B. fix something. After the encounters, defendant would give J.B. money and instruct her not to tell anybody. J.B. testified that after the incidents occurred she "would keep it together."
J.B. explained that she did not tell her brother about the abuse because she didn't want him to know and she felt her brother and her mother "[didn't] need to know." J.B. stopped visiting her father "maybe two or three years" before the trial, when she was fourteen, and did not explain to her mother why she no longer wanted to visit her father.
Defendant's current wife testified that she never observed any "unusual or untoward conduct" between defendant and his daughter. It was her custom to shop on Fridays when she picked up the children. If she had to pick something up on the weekends, she would go to a nearby market within minutes of the house. She did not recall any incident where defendant was in the bedroom with J.B. and instructed her to wait outside or not to enter.
R.B.III testified that he and his sister had a good relationship and were "pretty open" with each other. R.B.III stated that his sister never disclosed any allegations of abuse by defendant and he never saw anything that aroused his suspicions, except that J.B. "cried a lot" and one time, when he was about ten years old, he saw his sister naked in the bathroom. She *1228 appeared to be upset and crying while speaking with defendant. He could not see his father, nor could he hear what was said.
S.B., defendant's aunt, testified that she also had a close relationship with J.B. She explained that two summers before trial, after the alleged abuse, J.B. expressed a desire to live with defendant because she was upset with her mother.
S.B.'s husband, J.B.'s uncle, confirmed his wife's testimony, and also explained that when he had discussed with defendant the previous sexual assault against J.B. by her grandmother's husband, defendant exclaimed that "he felt that he let his daughter down" and "at one point he wanted to kill [the abuser]." According to S.B.'s husband, defendant was "very emotional" about his daughter's previous abuse and defendant "has never recovered from that."
A licensed private detective hired by the defense testified that R.B.III reported that defendant would not send anybody to the store on weekends, "because he would generally be sleeping." R.B.III specifically told the investigator that when he occasionally went out with defendant's current wife to get food or coffee, it generally took about ten minutes, and when they returned, defendant was usually asleep.
J.B.'s best friend in 1998 and 1999 testified that during the relevant time period she would spend the night at defendant's house "basically every weekend [J.B.] was [at defendant's house]," and thirty percent of the time she would stay over both Friday and Saturday nights. During the time she was staying with J.B., she did not observe anything unusual between J.B. and defendant, and J.B. never said anything about defendant molesting J.B.
About nine months before defendant's trial began, and about two years after the alleged abuse, J.B. told her cousin that her father had molested her. This disclosure took place in the "middle of the night" after her cousin had revealed that she had been physically abused. J.B.'s cousin testified that J.B. was "very upset" when she divulged the sexual abuse and was sitting with "her knees in her hands, like, rocking back and forth," and crying.
The cousin advised J.B. to tell her mother, but J.B. asked her cousin not to tell anyone because she "didn't want to go and do anything" and "didn't want to put [her] family through it." The cousin promised to keep the secret, but the next morning, she told her aunt, J.B.'s mother.
When confronted by her mother, J.B. was upset with her cousin for telling and refused to confirm the abuse. Upon being questioned by the police, however, J.B. admitted that "her dad had had sex with her" at his house and the incidents had "gone on for two or three years" but had stopped about two years prior. J.B. was "hysterical," "crying," "upset," and "very reluctant to give details."
Upon being arrested, defendant responded by saying "he couldn't believe it and he couldn't recall anything. He kept on saying that there was nothing there." During a formal statement, defendant stated that he didn't recall anything happening and if it did it would have occurred "[p]robably when I was drunk, if it did happen." Defendant stated "I don't remember, I don't recall anything. I don't know."
The jury convicted defendant and he has been incarcerated since November 6, 2002.

II.
The central and controlling issue in this case was J.B.'s credibility. Except for one ambiguous occurrence, where J.B.'s brother saw her naked in the bathroom talking with her father, there was no evidence apart from the victim's testimony of any *1229 suspicious behavior between defendant and J.B. and no witness to the alleged abuse of J.B. by defendant. Therefore, any error that impacted upon the jury's ability to fairly assess J.B.'s credibility would necessarily be prejudicial. That is the case, unfortunately, with each of the mistakes we discuss in the following sections of this opinion, and consequently we are constrained to reverse defendant's conviction. Because we are directing a new trial, it is not necessary to decide the other claims defendant has advanced, but it should be noted that all of the alleged errors we do not specifically address in this decision were either without merit or well within the trial judge's discretion.

A.
To attack J.B.'s credibility, defendant offered evidence that J.B. had told her paternal grandmother and "many family members" that she had been sexually assaulted by her coworkers at Burger King and that they had been fired. After the family spoke to her supervisor at the restaurant and the supervisor indicated that J.B. had never made any such reports, J.B. admitted to her family that she had lied. The court ruled the evidence inadmissible.
We acknowledge that a trial court's evidentiary rulings are "entitled to deference" and will not be reversed unless the court not only abused its discretion but was also clearly wrong. State v. Marrero, 148 N.J. 469, 483-84, 691 A.2d 293 (1997). We also acknowledge that the court was legitimately angry with defense counsel who appeared on the day of trial with a list of numerous witnesses who had not previously been disclosed.
Normally, except for prior convictions, "a trait of character cannot be proved by specific instances of conduct." N.J.R.E. 608. However, two years after defendant's trial and while defendant's appeal was pending, our Supreme Court established "a narrow exception to N.J.R.E. 608," that permits a defendant to challenge a victim-witness' credibility by introducing evidence that the victim has made prior false criminal accusations. State v. Guenther, 181 N.J. 129, 154, 854 A.2d 308 (2004). Although the Rape Shield Law restricts a defendant's ability to introduce evidence of the victim's "previous sexual conduct," N.J.S.A. 2C:14-7, a prior false allegation is not subject to the Law because the false allegation does not constitute "previous sexual conduct." State v. Bray, 356 N.J.Super. 485, 496, 813 A.2d 571 (App.Div.2003).
Under Guenther, the trial judge must determine at a N.J.R.E. 104 hearing, "by a preponderance of the evidence, whether the defendant has proven that a prior accusation charging criminal conduct was made by the victim and whether that accusation was false." Guenther, supra, 181 N.J. at 157, 854 A.2d 308. If defendant meets this burden, then the trial judge must consider specific factors, enumerated by the Court, to determine admissibility of the evidence. Ibid.
These factors include whether the victim's credibility is "the central issue," "the similarity of the prior false accusation to the crime charged," "the proximity of the prior false accusation" to the current charges, "the number of witnesses, the items of extrinsic evidence," the "time required for presentation of the issue," and whether the false accusation's probative value "will be outweighed by undue prejudice, confusion of the issues, and waste of time." Ibid.
The State argues simply that Guenther is inapplicable because it was decided after defendant's trial. Defendant merely argues that Guenther is directly on point and should be applied by this court on appeal. In fact, in over 200 pages of "briefs" neither the State nor defendant specifically *1230 addresses our jurisprudence governing retroactivity.
The first step in determining whether to apply a decision retroactively is to analyze whether a "new rule" has been created. Knight, supra, 145 N.J. at 249, 678 A.2d 642. We must determine whether the decision "`breaks new ground'" and "`was not dictated by precedent, existing at the time the defendant's conviction became final.'" Id. at 250-51, 678 A.2d 642 (quoting State v. Lark, 117 N.J. 331, 339, 567 A.2d 197 (1989)). Thus, only "`sudden and generally unanticipated repudiation of a long-standing practice,'" qualifies as a "new rule." State v. Afanador, 151 N.J. 41, 58, 697 A.2d 529 (1997) (quoting State v. Cupe, 289 N.J.Super. 1, 12, 672 A.2d 1233, certif. denied, 144 N.J. 589, 677 A.2d 761 (1996)).
If the decision is a "`new rule,' we look to three factors in deciding the extent of its retroactive application." State v. Natale, 184 N.J. 458, 493, 878 A.2d 724 (2005). These three factors include the purpose of the rule, the extent of reliance upon the old rule, and the effect of retroactive application upon the justice system. Ibid.
In this case, we first question whether Guenther established a "new rule." Guenther announced "we are not creating a new rule of evidence, but merely carving out a narrow exception to the common law rule embodied in N.J.R.E. 608." Guenther, supra, 181 N.J. at 159, 854 A.2d 308. In addition, Guenther pointed out that "many jurisdictions already allow the impeachment of a witness who has made a prior false criminal accusation." Ibid. Furthermore, related precedents exist in this State.
In State v. Ross, 249 N.J.Super. 246, 592 A.2d 291 (App.Div.), certif. denied, State v. V.R., 126 N.J. 389, 599 A.2d 165 (1991), we ordered a remand to determine whether a ten-year-old child's prior claim of abuse was admissible. In that case, the prosecutor had argued that the victim was too young and too inexperienced to fabricate the allegations against defendant. The prosecutor made this argument despite knowing that the child had made prior accusations of abuse against another person.
Although Ross can obviously be distinguished from the situation herein, Bray, supra, 356 N.J.Super. at 485, 813 A.2d 571, is more closely related and clearly foreshadowed Guenther. In Bray, we found that a hearing should have been conducted to determine whether the child victim had made prior allegations that "were probably false." Id. at 495-97, 813 A.2d 571. We instructed the trial court to determine admissibility by considering factors quite similar to those directed by the Supreme Court in Guenther. Id. at 497, 813 A.2d 571.
However, Bray, like Guenther, was also decided after defendant's trial in this case. Although Ross alone raises some question as to whether Guenther established a new rule, we assume that with regard to this case, Guenther specifically announced an "exception to the common law rule embodied in N.J.R.E. 608," which had not previously existed in this State. See Guenther, supra, 181 N.J. at 159, 854 A.2d 308. The Court's pronouncement that its decision was not "creating a new rule of evidence," was directed toward assuring the Legislature that it intended to follow the "prescribed statutory procedure" to conform the evidence rules to the Court's decision. See State v. D.R., 109 N.J. 348, 351-52, 537 A.2d 667 (1988). Consequently, we proceed to apply the retroactivity factors.
The purpose of the evidence exception established by Guenther was to "promote fairness in the trial process" by enhancing "the truth-seeking function" of the jury. Guenther, supra, 181 N.J. at 150, *1231 160, 854 A.2d 308. Such a purpose would be furthered by retroactive application because any injustice caused by a strict application of N.J.R.E. 608 could then be corrected.
However, there was widespread and lengthy reliance upon the pertinent evidence rule. For many years, our courts have followed the general principle contained in N.J.R.E. 608 and the preceding version, Evidence Rule 22, which prevent the use of specific instances of conduct, such as prior false accusations, to challenge a witness's credibility. E.g., State v. Mondrosch, 108 N.J.Super. 1, 4-5, 259 A.2d 725 (App.Div.1969), certif. denied, 55 N.J. 600, 264 A.2d 71 (1970); State v. Hummel, 132 N.J.Super. 412, 427-28, 334 A.2d 52 (App.Div.), certif. denied, 67 N.J. 102, 335 A.2d 54 (1975).
Neither party has indicated the extent of disruption that would ensue from retroactive application of this decision, though we assume that any retroactive application of a new principle will cause some disruption. We are uncertain, however, how many prior cases involved "a victim-witness whose credibility was the central issue in the case" and who had made a false criminal accusation against another that was ruled inadmissible under the existing evidence rules. Given the nature of sexual abuse cases, we must also acknowledge that any previous proceedings that meet this limitation probably involve emotionally distraught victims who are not eager to relive any prior painful experiences through additional testimony.
In weighing the three retroactivity factors, we conclude that the Guenther exception to N.J.R.E. 608 should be applied retroactively to this case, which was "in the pipeline" at the time Bray and Guenther were decided. See Natale, supra, 184 N.J. at 494, 878 A.2d 724 (explaining a new rule may be applied purely prospectively; prospectively to all cases except that in which the Rule was announced; or retroactively to cases "in the pipeline," meaning on direct appeal at the time the new Rule was announced; or fully retroactively to all cases); see also Knight, supra, 145 N.J. at 249, 678 A.2d 642.
Here, when J.B. was confronted by the prosecutor with defendant's charge that she had made a prior false accusation of sexual abuse, J.B. denied ever having made such a statement to her family or, for that matter, reporting her co-workers. The court, without conducting any N.J.R.E. 104 hearing, announced that it would not allow defendant's mother "to testify about something that never occurred." Proper application of Guenther would require that a N.J.R.E. 104 hearing be conducted to determine whether the false statement was made and if so whether it would be admissible. Such a hearing must be conducted on the remand.

B.
In addition, the court in this case denied defendant's request to introduce evidence of J.B.'s virginity and lack of sexual knowledge after the alleged onset of abuse. Without complying with the procedural requirements of the Rape Shield Law, N.J.S.A. 2C:14-7a, defense counsel indicated on the morning of the first trial date that J.B.'s aunt would testify that J.B. "confided to her that she had lost her virginity to a boy named [C.] in 1999 and began practicing birth control during that time period." The trial court appropriately held such evidence "completely inadmissible."
Defense counsel then indicated he would present J.B.'s ex-boyfriend to testify that she had told him she was a virgin during the relevant time period. The court abruptly precluded this testimony as well, obviously viewing defendant's last minute machinations as a "gigantic stall."
*1232 On the third day of trial, the defense again attempted to present evidence of J.B.'s chastity through a different witness. This time, defense counsel indicated that J.B.'s aunt would testify that "somewhere between 1999 and 2001" J.B. told her she was a virgin and asked her "what sexual intercourse feels like."
The court responded that it did not find this type of evidence "appropriate rebuttal material at the eleventh and a half hour, where the conversation is subject to so many interpretations and isn't clearly exculpatory to your client." After providing defense counsel repeated opportunity to explain the purpose of the proffered evidence, the court refused to permit introduction of the evidence and explained that the "Rape Shield Act Motion should have come in months ago," but such a motion "never was supplied."
The failure of counsel to comply with the procedural requirements of the Rape Shield Law, N.J.S.A. 2C:14-7a, undoubtedly created much of the confusion regarding the admissibility of this evidence. This was not newly discovered evidence of the type that might excuse defense counsel's failure to make this motion before "trial or preliminary hearing." Ibid.
The purpose of the Law was to eliminate the sexist assumption that "`unchaste women are more likely to consent and lie under oath than their virtuous sisters.'" State v. Budis, 243 N.J.Super. 498, 506, 580 A.2d 283 (App.Div.1990), aff'd, 125 N.J. 519, 593 A.2d 784 (1991) (quoting Harriett R. Galvin, Shielding Rape Victims in the State and Federal Courts: A Proposal For the Second Decade, 70 Minn.L.Rev. 763 (1986)). "[O]nly in situations where the relevance and probative worth of prior sexual experience are clear and substantial should the Rape Shield Law bend to the confrontation rights of the defendant." State v. Cuni, 159 N.J. 584, 608, 733 A.2d 414 (1999).
In this instance, the court should have separated the evidence of the victim's sexual conduct from the evidence alluding to her lack of sexual experience. "[E]vidence that the victim of a sexual assault is not a virgin is the precise kind of evidence which the Rape Shield Law was intended to ordinarily exclude." State v. Ogburne, 235 N.J.Super. 113, 121, 561 A.2d 667 (App.Div.1989). When and with whom the victim lost her virginity was subject to the Rape Shield Law and, given the late proffer, was correctly excluded by the trial court. Cuni, supra, 159 N.J. at 598, 733 A.2d 414.
However, the evidence that the victim claimed to be a virgin after the alleged attacks by her father began in 1998 does not implicate the Rape Shield Law, because it is not evidence of prior sexual conduct but is evidence of the lack of any prior sexual conduct. State v. Burke, 354 N.J.Super. 97, 102-03, 804 A.2d 617 (Law Div.2002). The alleged disclosure to J.B.'s aunt directly contradicts J.B.'s charge that defendant raped her beginning sometime in 1998, and would have been probative of her credibility. The evidence was ruled inadmissible without the court properly determining its precise nature and whether the probative value of the evidence would be substantially outweighed by any countervailing factors. N.J.R.E. 403. This was error.

C.
Besides precluding potentially admissible evidence offered by the defense, the court also allowed the State to present evidence through J.B.'s cousin about J.B.'s complaint of sexual abuse without instructing the jury on the proper use of such evidence.
"[T]o qualify as fresh complaint [evidence], the victim's statement to someone *1233 she would ordinarily turn to for support must have been made within a reasonable time after the alleged assault and must have been spontaneous and voluntary." State v. L.P., 352 N.J.Super. 369, 380, 800 A.2d 207 (App.Div.2002) (quoting State v. Hill, 121 N.J. 150, 163, 578 A.2d 370 (1990)). Even though this complaint was made several years after the alleged abuse ceased, neither party contends that the evidence was not "fresh complaint." See L.P., supra, 352 N.J.Super. at 382-84, 800 A.2d 207 (explaining the allowance of additional time for children to complain and the relationship of this doctrine to the Child Sexual Abuse Accommodation Syndrome).[3]
"Fresh-complaint evidence serves a narrow purpose. It allows the State to negate the inference that [because of her silence] the victim was not sexually assaulted." State v. Hill, 121 N.J. 150, 163, 578 A.2d 370 (1990). Its purpose "is to allow the State to meet in advance the negative inference which would be drawn from the absence of evidence that the victim reported the incident to one to whom she would naturally turn for comfort and advice." State v. J.S., 222 N.J.Super. 247, 256, 536 A.2d 769 (App.Div.), certif. denied, 111 N.J. 588, 546 A.2d 513 (1988). Fresh complaint evidence is "to prove only that the alleged victim complained, not to corroborate the victim's allegations concerning the crime." State v. Bethune, 121 N.J. 137, 146, 578 A.2d 364 (1990).
Because of the limited nature of this evidence, it is crucial for the trial court to instruct the jury on how to utilize such evidence. State v. Buscham, 360 N.J.Super. 346, 359, 823 A.2d 71 (App.Div. 2003). The victim's delay in reporting or silence may be considered by the jury in assessing the victim's credibility, but the jury must also be told that the "silence or delay, in and of itself, is not inconsistent with a claim of abuse." State v. P.H., 178 N.J. 378, 396-97, 840 A.2d 808 (2004). The evidence can be considered by the jury in opposition to credibility concerns that may develop regarding the victim's truthfulness because of a failure to complain to a confidant, but the evidence cannot be used to support the fact of abuse.
We acknowledge that the record reflects that defense counsel briefly cross-examined J.B.'s cousin about some of the details of the abuse complaint, which could not have been admitted by the State. This was an apparent attempt to show that the abuse could not have occurred because what J.B. told her cousin was discordant with her testimony. Defense counsel also argued forcefully before the jury that J.B.'s delay in reporting the alleged abuse indicated that the abuse did not occur. The State argues that the absence of an instruction did not prejudice defendant because a proper charge would have informed the jury that it could still find abuse despite the delay in reporting. While this may be so, that is not the problem.
The jury convicted defendant, and we do not know how the jury reacted to defendant's argument or cross-examination of J.B.'s cousin. In the absence of an instruction, and especially considering the conviction, we must assume that the jury was not impressed with defense counsel's argument or cross-examination and, most significantly, may have improperly used the fact of the complaint as corroboration of J.B.'s testimony that she was abused by her father.
*1234 As we have said numerous times, "[a]ppropriate and proper charges to a jury are essential for a fair trial." State v. Green, 86 N.J. 281, 287, 430 A.2d 914 (1981). "Erroneous instructions on matters or issues that are material to the jury's deliberation are presumed to be reversible error in criminal prosecutions." State v. Jordan, 147 N.J. 409, 422, 688 A.2d 97 (1997). Here, the absence of an instruction constituted plain error.

D.
Finally, comments of the trial judge and prosecutor during a sidebar conference were inadvertently played to the jury during a playback of the testimony of R.B.III. The court indicated that the improper exposure was only "two or three seconds" and it believed that the jury could not have heard the comments. Defense counsel countered, however, that he "heard fairly loud and clearly [the judge's] voice indicating that the boy couldn't be any more heartbroken. I heard that very clearly and I don't hear the best."
The reference by the judge during the sidebar apparently related to the brother's demeanor when he testified about seeing his naked sister talking to his father in the bathroom. If the jury heard the judge's comment regarding R.B.III's credibility, the defendant could have been prejudiced. Since the jury asked for the playback, the brother's testimony must have been considered significant. Because a new trial must be granted, we simply advise that care must be taken to ensure that such an error does not occur again.

III.
In conclusion, even disregarding the possible mischief that ensued from the mistaken playback, the three errors referenced above were prejudicial and deprived defendant of a fair trial. The mistakes either deprived the jury of probative evidence that should have been available to assess J.B.'s credibility or allowed the jury to consider credibility evidence for an improper purpose.
Reversed and remanded for a new trial.
NOTES
[1] Defendant's alleged points of error are as follows:

Point I. The interests of justice demanded that defense counsel's repeated and legitimate requests for a postponement should have been granted.
Point II. The trial court committed reversible error by disallowing the defense to present evidence of contemporaneous false allegations of sexual abuse made by the alleged victim.
Point III. Improper application of the rape shield statute deprived the defendant of favorable evidence, altered the evidence in the State's favor, and denied the defendant a fair trial.
Point IV. The trial court committed reversible error by disallowing the defense to impeach the so-called fresh complaint witness and J.B. concerning Marijuana use and false sworn statements.
Point V. The trial court erred by disallowing the defense to present consentually recorded conversations while allowing the State's witnesses to reference them out of context and in a misleading manner.
Point VI. The trial judge's failure to provide a limiting instruction as to the jury's use of the fresh complaint evidence constituted plain error. (Not raised below).
Point VII. The prosecutor's comments as to J.B.'s lack of motive to bolster her credibility mandate a new trial. (Not raised below).
Point VIII. The court committed plain error by not declaring a mistrial or providing any limiting instruction after the trial judge's and prosecutor's prejudicial side bar comments were inadvertently made privy to the jury during a play back of testimony. (Not raised below).
Point IX. The verdict must be reversed because it was against the weight of the evidence.
Point X. The accumulation of judicial errors in this case warrants a new trial. (Not raised below).
[2] Because we have struggled through the overly long opposition brief of the State, we see no reason, at this time, to deny its motion to file a 109 page responsive brief. Accordingly, we begrudgingly grant the State's motion, which was referred to us by an Appellate Division order of February 2, 2006.
[3] Child Sexual Abuse Accommodation Syndrome is "a psychological theory explaining why sexually-abused children delay reporting abuse." State v. P.H., 353 N.J.Super. 527, 534, 803 A.2d 661 (App.Div.2002), aff'd, 178 N.J. 378, 840 A.2d 808 (2004).