**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2031-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

G.S.M.,

    Defendant-Appellant.

_____

Submitted September 11, 2023 – Decided December 16, 2024

Before Judges DeAlmeida, Berdote Byrne and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law Division, Warren County, Indictment No. 19-07-0254.

Joseph E. Krakora, Public Defender, attorney for appellant (Kevin S. Finckenauer, Assistant Deputy Public Defender, of counsel and on the briefs).

James L. Pfeiffer, Warren County Prosecutor, attorney for respondent (Naya A. Tsang, Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

DeALMEIDA, J.A.D.

Defendant G.S.M. appeals from a judgment of conviction entered after a jury convicted him of three counts arising from the sexual assault of his step-daughter, D.B., when she was a minor, as well as the restitution component of his sentence.[1]  We affirm.

I.

In 2019, defendant was married to E.M.  They lived with E.M.'s two minor children:  D.B., and her brother, A.B., who was two years older than D.B.

At trial, D.B. testified to the following.  In the early morning hours of April 25, 2019, when D.B. was twelve years old, she was in her bedroom laying on her bed using her cellphone.  She heard someone enter the room. The person sat on the edge of the bed, then laid down next to her.  D.B. testified she was one-hundred percent certain the person was defendant because "for a split second, [she] looked up to see who it was."  She also testified she was one-hundred percent sure the person was not her brother.

---

[1]  We refer to defendant and others by their initials to protect from public disclosure the identity of child victims of sexual assault.  R. 1:38-3(c)(9).

Once defendant laid down next to her, D.B. turned over on her side to look at her alarm clock, which read 2:01 a.m. D.B. then closed her eyes, which she kept shut for the remainder of the assault to make it appear she was asleep.

Defendant pulled D.B. close to him and touched her vagina both over and under her clothes. He penetrated her vagina with his hand, which "was very painful and uncomfortable." Neither D.B. nor defendant said anything.

Defendant then picked D.B. up and carried her to the living room. As she was being carried, D.B. faced defendant with her head on his shoulder and her legs wrapped around him. She could feel his facial hair rubbing against her.

In the living room, defendant laid D.B. on a couch, laid down next to her, touched her vagina under her clothing, and penetrated her with his hands. The penetration was painful and D.B. heard what she thought was defendant using lotion. Defendant put his hands on D.B.'s buttocks and kissed her breasts. Again, neither defendant nor D.B. said anything. D.B. did not yell for help from her mother or brother, who were home, because she was afraid defendant would physically attack her.

A-2031-21

After defendant stopped assaulting D.B., she heard what sounded like him wiping his hands on his shirt or the couch. Eventually, defendant got up from the couch, went to the kitchen, opened the refrigerator, and took a drink, which smelled to D.B. like alcohol.

Defendant then picked up D.B. and carried her to an upstairs guest bedroom. Defendant laid D.B. down on the bed, laid down next to her, and touched her again on her vagina with his hands both over and under her clothing. Defendant again penetrated D.B.'s vagina with his hand, causing her pain. After defendant left the room, D.B. remained in the bed and covered herself with a sheet, fearing defendant would return.

D.B. eventually got up from the bed and walked to her mother's bedroom, where she found her mother and defendant next to each other in bed. D.B. laid down on the left side of the bed, with her mother between D.B. and defendant. Defendant asked D.B.'s mother several times why D.B. was in bed with them.

D.B. later followed her mother to the bathroom and told her she had had a nightmare. D.B. did not tell her mother about the assaults because she was afraid of how she would react. D.B. testified she was one-hundred percent sure that the attacks were not a nightmare.

A-2031-21

The following day, D.B.'s vagina was sore. When she urinated, she felt a burning sensation and bled slightly.

In the morning, D.B. went to school, where she planned to tell her best friend, twelve-year-old S.D., about the assaults. However, S.D. was absent from school that day. At about 9:00 p.m., D.B. sent a message to S.D. through Instagram. During a subsequent exchange of messages, D.B. told S.D. defendant had sexually assaulted her. Immediately thereafter, S.D. showed the messages to her mother, M.F., who promptly took S.D. to the police station to report the messages.

Later that night, police officers arrived at D.B.'s home. They asked to speak with D.B. and her mother outside. In the presence of the officers, D.B.'s mother asked her if defendant had sexually assaulted her. D.B. said yes and recounted the details of the assaults. Shortly thereafter, D.B. was interviewed by a detective. Afterwards, D.B. was taken to the hospital where a rape kit, including the collection of DNA samples, was performed on her. The nurse informed D.B. she had a small cut on her vagina.

A grand jury subsequently indicted defendant, charging him with: second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1);

first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1); and second-degree sexual assault, N.J.S.A. 2C:14-2(b).

Prior to trial, the State moved to admit the contents of the Instagram messages under the fresh complaint exception to the hearsay rule. After a hearing at which S.D. testified, the trial court granted the State's motion. The court found D.B. disclosed the sexual abuse to a trusted, neutral confidant close in time to the assaults and the disclosure was self-motivated. Thus, the court concluded the messages were admissible for the purpose of establishing D.B. made the disclosure and the time of the disclosure, but not for the purpose of establishing the truth of the statements she made in the messages.

At trial, the assistant prosecutor questioned D.B. about the messages, but did not ask her about the content of the messages. D.B. confirmed only the general statement that in the messages she disclosed to S.D. that defendant had sexually assaulted her.

M.F. testified that when S.D. showed her the messages, S.D. was "hysterically crying." M.F. did not reveal the content of the messages, but testified that after she read them she took her daughter to the police station to report their contents. M.F. cried during her testimony after being shown a printout of the messages, saying she did not wish to look at them.

A-2031-21

Dr. Gladibel Medina, a pediatrician who specializes in child abuse, testified as a medical expert. She performed a medical evaluation on D.B. in September 2020, at the request of D.B.'s family. Medina reviewed photographs of the injury to D.B.'s genital area. She testified the "photographs showed an area of increased redness" at the vaginal opening and a "laceration . . . underneath or inferior to that vaginal opening." Medina opined that the injury was consistent with a scratch by a fingernail.

Amanda Battaglia testified as a DNA expert. She testified that samples collected from stains on D.B.'s underwear, and vaginal, anal, and external genital swabs showed D.B. as the only source of DNA. However, samples taken from defendant's fingernail clippings from both hands showed a mixed DNA profile from two contributors.

Battaglia determined with respect to the right-hand fingernail samples that defendant was the major contributor and D.B. was the minor contributor. The expert undertook a statistical evaluation on the minor profile found in right-hand nail clippings to determine the rarity of D.B.'s DNA profile. She explained the results of the evaluation as follows:

> the rarity of this profile meets our threshold for source-attribution of one-in-[seven]-trillion. Meaning, I would not expect to see this profile in more than one person in every [seven]-trillion that I look at.

A-2031-21

. . . .

> So the approximate world population is about [seven]-billion people. So I would need to travel to approximately 1,000 different planet [E]arths each with their own unique population before I would expect to see this DNA profile again at random.

Battaglia also testified that there are different concentration levels of DNA in different types of cells. She explained:

> DNA is present in all the nucleated cells of your body; however, depending on what type of sample is collected, you can get different concentrations of DNA. And that's based on ultimately the cell counts.
>
> So, for example, in bodily fluids such as semen, blood, saliva, we do expect that there are a lot of cells in those samples; and therefore, we will get what is known as a high quantity of DNA.
>
> . . . .
>
> Other items that are known as, for example, "touch items," where you're getting the cells basically from somebody touching an object and leaving some skin cells behind. Those generally tend to be a lower cell count, and will, therefore, be indicated by a most-often lower quantity of DNA that's ultimately detected.

Battaglia testified that, with respect to the right-hand nail clippings, the DNA concentration from D.B. was at a very high level generally found in "semen, blood, bodily fluid, [and] vaginal secretion samples."

8

A-2031-21

Battaglia acknowledged a DNA sample was not collected from D.B.'s mother. As a result, she could not exclude D.B.'s mother as the minor contributor in the right-hand nail clippings sample. With respect to the left-hand nail clippings, Battaglia testified there was not "enough information detected to make any qualitative comparisons for this minor" contributor.

Defendant called family members who testified the allegations were inconsistent with his character. In addition, he introduced MRI reports showing he suffered from a herniated disc in his back and took prescribed medications to manage pain to cast doubt on allegations that he lifted and carried D.B.

The jury convicted defendant on all counts. The trial court merged the second-degree sexual assault conviction into the first-degree aggravated sexual assault conviction and sentenced defendant to twenty-five years of imprisonment without the possibility of parole. For the second-degree endangering conviction, the court sentenced defendant to a concurrent eight-year term of imprisonment. The court also imposed $22,500 in restitution.

This appeal followed. Defendant raises the following arguments.

POINT I

ALTHOUGH FRESH COMPLAINT EVIDENCE
WAS INTRODUCED AT TRIAL, THERE WAS NO

LIMITING INSTRUCTION TELLING THE JURY IT COULD NOT USE THE FRESH COMPLAINT EVIDENCE AS EITHER SUBSTANTIVE EVIDENCE OF [DEFENDANT'S] GUILT OR AS CORROBORATIVE EVIDENCE OF THE VICTIM'S TESTIMONY. THAT ERROR WAS COMPOUNDED BY THE PROSECUTOR'S IMPROPER REMARKS ABOUT THE MESSAGES DURING SUMMATION.

POINT II

THE TRIAL COURT ERRED IN FAILING TO GIVE AN IN-COURT IDENTIFICATION INSTRUCTION WHEN THE VICTIM'S IDENTIFICATION OF [DEFENDANT] WAS THE MOST IMPORTANT PIECE OF EVIDENCE AGAINST HIM AND IT WAS FOUNDED ONLY ON A BRIEF GLANCE IN A COMPLETELY DARK ROOM WITH NO LIGHTS.

POINT III

THE PROSECUTOR REPEATEDLY AND INFLAMMATORILY DENIGRATED DEFENSE COUNSEL BY ARGUING TO THE JURY THAT HIS HANDLING OF THE MOST IMPORTANT PIECES OF EVIDENCE – D.B.'S TESTIMONY AND THE DNA EVIDENCE – WAS MERELY "TRYING TO CONFUSE" THEM.

POINT IV

THE STATE GROSSLY MISSTATED THE VALUE OF THE DNA EVIDENCE BY CONVERTING THE RANDOM PROBABILITY MATCH INTO A SOURCE PROBABILITY.

10

POINT V

THE CUMULATIVE IMPACT OF THE ERRORS
DESCRIBED IN POINTS I, II, II, AND IV DENIED
[DEFENDANT] DUE PROCESS AND A FAIR
TRIAL.

POINT VI

THE TRIAL COURT ERRED IN IMPOSING
EXCESSIVE RESTITUTION WHEN [DEFENDANT]
HAS NO ABILITY TO PAY.

II.

A.    Fresh Complaint Limiting Instruction.

The fresh complaint "doctrine allows the admission of evidence of a victim's complaint of sexual abuse, otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated." State v. R.K., 220 N.J. 444, 455 (2015). "In order to qualify as fresh-complaint evidence, the victim's statement must have been made spontaneously and voluntarily, within a reasonable time after the alleged assault, to a person the victim would ordinarily turn to for support." Ibid. (citing State v. W.B., 205 N.J. 588, 616 (2011)). "These requirements are relaxed when they are applied to juvenile victims." Ibid. (citing State v. Bethune, 121 N.J. 137, 143-44 (1990)).

"Fresh complaint evidence is 'to prove only that the alleged victim complained, not to corroborate the victim's allegations concerning the crime.'" State v. R.E.B., 385 N.J. Super. 72, 89 (App. Div. 2006) (quoting Bethune, 121 N.J. at 146). Thus, "[o]nly the facts that are minimally necessary to identify the subject matter of the complaint should be admitted; the fresh-complaint testimony is not to be used 'to corroborate the victim's allegations concerning the crime.'" R.K., 220 N.J. at 456 (citing Bethune, 121 N.J. at 146).

"Because of the limited nature of this evidence, it is crucial for the trial court to instruct the jury on how to utilize such evidence." R.E.B., 385 N.J. Super. at 89 (citing State v. Buscham, 360 N.J. Super. 346, 359 (App. Div. 2003)). "The evidence can be considered by the jury in opposition to credibility concerns that may develop regarding the victim's truthfulness because of a failure to complain to a confidant, but the evidence cannot be used to support the fact of abuse." Ibid.

Defendant does not contest the admission of the evidence of D.B.'s fresh complaint, which consisted only of the fact that she disclosed sexual abuse by defendant in the messages she exchanged with S.D. Defendant argues, however, that the trial court's failure to instruct the jury on the limited use of the evidence warrants reversal of his convictions. He argues the instruction

error was exacerbated by the assistant prosecutor's statements in summation that the fresh complaint evidence corroborated D.B.'s testimony about the details of the assaults. Defendant also notes that in her summation, the assistant prosecutor invited the jurors to surmise the contents of the messages based on M.F.'s testimony that her daughter was crying after reading the messages and on M.F. crying when shown a printout of the messages during trial.

During their deliberations, the jury asked to see the content of the messages. The court informed the jurors the contents of the messages were not in evidence and therefore could not be provided to them.

Defendant did not object to the absence of the limiting instruction. It is well-settled that "[a]ccurate and understandable jury instructions in criminal cases are essential to a defendant's right to a fair trial." State v. Concepcion, 111 N.J. 373, 379 (1988). However, "[i]f the defendant does not object to the charge at the time it is given, there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." State v. Singleton, 211 N.J. 157, 182 (2012).

Therefore, "the failure to object to a jury instruction requires review under the plain error standard." State v. Wakefield, 190 N.J. 397, 473 (2007).

As applied to a jury instruction, plain error requires demonstration of "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."

[State v. Chapland, 187 N.J. 275, 289 (2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969)).]

The error "must be evaluated in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting Chapland, 187 N.J. at 289).

The mere possibility of an unjust result is not enough to warrant reversal of a conviction. State v. Jordon, 147 N.J. 409, 422 (1997). "Thus, the error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached." R.K., 220 N.J. at 456 (citing State v. Daniels, 182 N.J. 80, 95 (2004)). "Plain error is more likely to be found if there is any indication that jurors considered the fresh-complaint testimony for an improper purpose." Ibid. "However, if the State's case is particularly strong, any fresh-complaint instruction errors may be deemed harmless." Ibid. (citing State v. Tirone, 64 N.J. 222, 227 (1974)).

We have reviewed the record and conclude the trial court's failure to provide a limiting instruction does not warrant reversal of defendant's

14

convictions. There is no dispute the contents of the messages were not revealed to the jury or admitted into evidence. Testimony was limited to general statements that in the messages D.B. disclosed to S.D. that defendant sexually abused her.

Defendant speculates that because M.F. cried while testifying about the messages and testified that S.D. was crying after she read the messages, her testimony "created the space for the jury to infer that the content of the messages was extremely disturbing, and to wonder – without any helpful instruction from the judge – what might be in the messages." We see no support in the record for this supposition.

The jury was aware, as is permitted under the fresh complaint doctrine, that the messages conveyed a disclosure by a twelve-year-old girl that her stepfather had sexually assaulted her. Nothing in the record suggests that the messages contained any details beyond the disclosure or that the disclosure alone – without the details of the abuse – would not be sufficiently disturbing to make S.D. and her mother cry. Nor is there any indication the jury considered the fact of D.B.'s disclosure as corroboration of her testimony detailing the acts of sexual abuse inflicted on her by defendant.

The assistant prosecutor's summation does not, as defendant argues, invite the jury to speculate on the contents of the messages or to consider the messages as corroboration of D.B.'s account of the assaults. In support of his argument, defendant points to the following passage from the assistant prosecutor's summation: "[D.B.] disclosed to her friend [S.D.]. That was corroborated by Instagram messages that are not in evidence and you will not know the contents of those conversations. But you did hear testimony from [S.D.'s] mother, [M.F.]." That statement, however, suggests only the fact of D.B.'s disclosure is corroborated by the existence of the messages and M.F.'s testimony that her daughter received the messages, and not that the jurors should surmise the contents of the messages or that the contents corroborate D.B.'s testimony describing the assaults.

The facts in Buscham, on which defendant relies, are materially different from those presently before the court. In Buscham, we held the failure to provide a limiting instruction with respect to fresh complaint testimony warranted reversal because the assistant prosecutor told jurors in summation that they "can believe" the victim's testimony detailing a sexual assault based on the emotional testimony of the witnesses who recounted the victim's fresh complaint. 360 N.J. Super. at 359-60. Here, the assistant prosecutor did not

16

suggest the jurors could find D.B.'s testimony to be corroborated by the emotional response of M.F. and her daughter to the messages.

Nor are we convinced by defendant's argument that the jury's request to see the contents of the messages establishes they relied on the messages for an improper purpose. The contents of the messages were not in evidence and were not, therefore, shown to the jury. It is mere speculation on defendant's part that the jurors imagined the contents of the messages and assumed they corroborated D.B.'s testimony. Nothing in the record supports that speculation.

B.    In-Court Identification Instruction.

At trial, D.B. identified defendant, who was seated in the courtroom. Defendant argues the trial court erred by not giving the jurors an in-court identification instruction. He argues the State's case was primarily based on D.B.'s identification of defendant, and in light of D.B.'s admission that she saw her assailant only for a "split second" in a dark room, the instruction was critical to him having a fair trial.

"When identification is a 'key issue,' the trial court must instruct the jury on identification, even if a defendant does not make that request." State v. Cotto, 182 N.J. 316, 325 (2005) (quoting State v. Green, 86 N.J. 281, 291

17

(1981)).  Identification is a key issue "in cases where the State relies on a single victim-eyewitness."  Ibid. (citing State v. Frey, 194 N.J. Super. 326, 329 (App. Div. 1984)).  Thus, the trial court should have given an identification instruction to the jurors, even if not requested.

However, defendant did not object to the absence of an identification instruction.  We, therefore, review the record for plain error.  Wakefield, 190 N.J. at 473.  In doing so, we make a determination based on whether the corroborative evidence of defendant's guilt is sufficiently strong to overcome the absence of the instruction, and not on whether defendant's misidentification argument is convincing.  State v. Davis, 363 N.J. Super. 556, 561 (App. Div. 2003); Cotto, 182 N.J. at 326.

Here, the corroborating evidence of defendant's guilt included the presence of D.B.'s DNA under his fingernails.  That evidence corroborates D.B.'s detailed account of the manner in which she was assaulted.  In addition, D.B.'s identification of defendant must be viewed in the context of her relationship to him.  At the time of the assaults, D.B. had lived with defendant for seven years.  No other adult male lived in the home.  She was, therefore, familiar with defendant and his physique.  D.B. also felt defendant's facial hair against her skin when he carried her from room to room, confirming an aspect

of his physical features known to her.  In addition, D.B. heard defendant go to the refrigerator to obtain an alcoholic drink during the assault, and he moved her among several rooms, suggesting a familiarity with the home.  Lastly, D.B. identified defendant shortly after the assaults in the messages she exchanged with S.D. and never wavered in her identification of him as her assailant.

Moreover, the trial court instructed the jury on its obligation to determine whether the State had proven each element of the charged offenses. For example, with respect to the endangering charge, the instructions read, in relevant part, "[t]o find [defendant] guilty of this crime the State must prove beyond a reasonable doubt . . . that defendant knowingly engaged in sexual conduct which would impair or debauch the morals of a child [and] . . . that defendant had a legal duty for the care of the child . . . ."  Thus, read as a whole, the jury instructions did not permit the jurors to conclude they could convict defendant if the State had not established beyond a reasonable doubt that he was the person who sexually assaulted D.B.  Cotto, 182 N.J. at 326-27; State v. Gaines, 377 N.J. Super. 612, 625-26 (App. Div. 2005).

C.    Prosecutorial Misconduct.

Defendant argues that in her summation, the assistant prosecutor repeatedly and inflammatorily denigrated defense counsel by stating he was

attempting to confuse the jury with respect to the DNA evidence. He argues the comments were particularly damaging due to the crucial nature of that evidence.

"Prosecutors are expected to assert vigorously the State's case and are given considerable leeway in delivering their summations." Daniels, 182 N.J. at 96. However, "[t]hey are duty-bound to confine their comments to facts revealed during the trial and reasonable inferences to be drawn from that evidence." State v. Frost, 158 N.J. 76, 85 (1999).

"Not every improper prosecutorial statement will warrant a new trial." Daniels, 182 N.J. at 96. "[P]rosecutorial misconduct is not grounds for reversal of a criminal conviction unless the conduct was so egregious as to deprive defendant of a fair trial." State v. Timmendequas, 161 N.J. 515, 575 (1999). "To justify reversal, the prosecutor's conduct must have been 'clearly and unmistakably improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Ibid. (quoting State v. Roach, 146 N.J. 208, 219 (1996)).

In our analysis, we consider: "(1) whether defendant made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken

from the record and instructed the jury to disregard them." State v. Jones, 364 N.J. Super. 376, 384 (App. Div. 2003) (quoting Frost, 158 N.J. at 87).

In her summation, the assistant prosecutor stated that defense counsel was attempting to confuse the jury and raising a red herring. She stated that the

> [d]efense is trying to confuse you, ladies and gentlemen. They are trying to get you and asking you to ignore the very things that I think are the foundation of your decision making. And that would be your intelligence, your experience and your common sense.
>
> . . . .
>
> So in sum, and to address defendant's red herring, it is used to confuse you regarding the DNA. It's important to remember that DNA is all you need.
>
> . . . .
>
> So this case, although the [d]efense wants to confuse you and make it about things other than [D.B.] and the defendant, this case is really about what the defendant did to [D.B.].

After the State's closing, defendant objected, arguing that the summation had "disparaged the defense." After hearing argument from counsel, the trial court concluded:

> I don't know that anything [the State] said rises to the level of disparaging the [d]efense.

21

> [A]s far as the disparaging the [d]efense remarks go . . . I think they're entitled to at least some leeway in arguing that what the [d]efense said in their closing isn't really what you heard.
>
> . . . .
>
> So I'm not going to give any curative instruction on any of that.

We agree with the trial court's assessment of the comments made during the State's summation. The comments to which defendant objected do not rise to the level of disparagement of defense counsel. In the comments, which were limited, the assistant prosecutor did not demean the role of defendant's attorney. She instead argued, in effect, that defense counsel was urging the jury to focus on evidence other than that which established defendant had sexually assaulted D.B. Even if the assistant prosecutor's reference to defense counsel's intent to confuse the jury was improper, it was an isolated remark and does not warrant reversing defendant's convictions.

The precedents on which defendant relies, and in which convictions were reversed based on prosecutorial misconduct, concern improper statements directly addressing the role of defense counsel made with other improper remarks, which, when considered together with other errors, warranted

22

reversal.  See e.g., Frost, 158 N.J. at 81-88 (reversing convictions for multiple improper statements by assistant prosecutor, including "don't be distracted by lawyer talk" by defense counsel, while recognizing that "we do not adopt a per se rule that requires reversal of every conviction whenever there is evidence of egregious prosecutorial misconduct during trial."); State v. Pindale, 249 N.J. Super. 266, 279-86 (App. Div. 1991) (reversing convictions based on improperly admitted evidence and for several improper statements by assistant prosecutor, including "the defense's role in this case is to try to confuse you."); State v. Lockett, 249 N.J. Super. 428, 433-34 (App. Div. 1991) (reversing convictions based on improperly admitted evidence, improper questioning of defendant during cross-examination, and the assistant prosecutor's summation, which included comment that it is "typical" for defense counsel to distract jurors with irrelevant information to keep them from looking at the facts in evidence).  We do not find equivalent circumstances to be present here.

D.    DNA Evidence.

Defendant argues the State grossly misstated the value of the DNA evidence by converting the "random probability match" into a source probability match.  In his brief, defendant correctly describes the expert's testimony regarding the test results as confirming there is a "one[-]in[-]seven[-

23

]trillion probability match . . . of the DNA under [defendant's] fingernails to D.B.'s DNA, meaning one would expect one out of seven trillion random people to have the same DNA profile."  He argues the State distorted the evidence by arguing to the jury that the expert testified there is only a one-in-seven-trillion chance that the DNA under defendant's fingernails belonged to someone other than D.B.

Defendant argues the State's misrepresentation is a common one referred to as the "prosecutor's fallacy."  As explained in <u>McDaniel v. Brown</u>, 558 U.S. 120, 128 (2010):

> The prosecutor's fallacy is the assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample.  In other words, if a juror is told the probability a member of the general population would share the same DNA is [one] in 10,000 (random match probability), and he [or she] takes that to mean there is only a [one] in 10,000 chance that someone other than the defendant is the source of the DNA found at the crime scene (source probability), then he [or she] has succumbed to the prosecutor's fallacy.  It is further error to equate source probability with probability of guilt, unless there is no explanation other than guilt for a person to be the source of crime-scene DNA. This faulty reasoning may result in an erroneous statement that, based on a random match probability of [one] in 10,000, there is a 0.01% chance the defendant is innocent or a 99.99% chance the defendant is guilty.

24

[(citation omitted)].

Because defendant did not object to the assistant prosecutor's statement, we review the record for plain error. <u>Wakefield</u>, 190 N.J. at 473. According to defendant, the State's misstatement clouded the jury's understanding of the DNA evidence and undermined the propriety of the jury verdict, warranting reversal of his convictions.

The State, while not expressly conceding it mischaracterized the evidence, argues any misstatement by the assistant prosecutor was harmless. The State notes the jury asked to review the DNA evidence testimony after summations.

That testimony included Battaglia's testimony that threshold source attribution of one in seven trillion means she'd "expect to see [the DNA profile] in less than one out of every [seven] trillion people, it exceeds that [which] we call 'source attribution,' where we can say with confidence that the profile came from a specific person." The State also notes that Battaglia answered "yes" to the question of whether she was confident, based on her training and experience, that D.B. was the source of the minor contributor DNA found under defendant's fingernails.

25

In addition, the State points out that defendant is linked to the sexual assaults by D.B.'s testimony, including her identification of him as her assailant. Finally, the State notes the court instructed the jury that they were only permitted to consider witness testimony and the physical evidence, and not the arguments made during summation.

We are persuaded by the State's arguments. While the assistant prosecutor's comments mischaracterized the value of the DNA evidence, we conclude that the misstatements were not plain error. As explained above, the record demonstrates that after the misstatements, the jurors were instructed to rely on witness testimony and physical evidence and not the remarks made during summations. In addition, the jury heard for the second time the expert's testimony with respect to probabilities after the summations and the DNA evidence was not the sole evidence connecting defendant to the sexual assaults.

E.    Cumulative Error.

When addressing claims of cumulative error, the Supreme Court

> repeatedly [has] made clear that [t]he proper and
> rational standard [for the review of claimed trial
> errors] is not perfection; as devised and administered
> by imperfect humans, no trial can ever be entirely free
> of even the smallest defect. Our goal, nonetheless,

26

> must always be fairness. "A defendant is entitled to a fair trial but not a perfect one."
>
> [Wakefield, 190 N.J. at 537 (second and third alterations in original) (quoting State v. R.B., 183 N.J. 308, 333-34 (2005)).]

Thus, where legal errors occur but do not individually warrant reversal of a conviction, if those errors "in their aggregate have rendered the trial unfair, our fundamental constitutional concepts dictate the granting of a new trial before an impartial jury." State v. Orecchio, 16 N.J. 125, 129 (1954). "[T]he predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair." Wakefield, 190 N.J. at 538.

We disagree with defendant's argument that the errors he raised have the cumulative effect of rendering his trial unfair.

F. Restitution.

The "amount and manner of payment of reasonable restitution is a matter for the judgment of the sentencing judge." State v. Martinez, 392 N.J. Super. 307, 318-19 (App. Div. 2007) (quoting State v. Harris, 70 N.J. 586, 598 (1976)). "[R]estitution is proper only when the loss sustained by a victim is the direct result of the criminal offense." State v. Newman, 132 N.J. 159, 169 (1993). In imposing restitution, "the court must balance the goals of victim-

compensation and offender-rehabilitation, and thoughtfully establish a fair and reasonable amount of restitution and method of repayment." Id. at 173. Before imposing restitution, "due process requires a hearing on both the ability to pay and the time period for making restitution." State v. McLaughlin, 310 N.J. Super. 242, 264 (App. Div. 1998) (quoting State v. Orji, 277 N.J. Super. 582, 589 (App. Div. 1994)).

Specifically, before imposing restitution, courts are to consider "if the defendant is able, or given a fair opportunity to do so, will be able to . . . make restitution . . . ." Newman, 132 N.J. at 169 (quoting N.J.S.A. 2C:44-2(b)). "If the court is satisfied that a defendant possesses or could possess that ability, it may set 'the amount and method of payment . . . tak[ing] into account the financial resources of the defendant and the nature of the burden that its payment will impose.'" Ibid. (alterations in original) (quoting N.J.S.A. 2C:44-2(c)). "[I]n determining the amount and method of payment of restitution, the court . . . shall set the amount of restitution so as to provide the victim with the fullest compensation for loss that is consistent with the defendant's ability to pay." McLaughlin, 310 N.J. Super. at 263 (quoting N.J.S.A. 2C:44-2(c)).

"The court is required to state on the record the reasons for imposing the sentence, 'including [its] findings pursuant to the criteria for . . . imposing . . .

28

fines under N.J.S.A. 2C:44-1 to 2C:44-3 . . . .'" State v. Ferguson, 273 N.J. Super. 489, 499 (App. Div. 1994) (quoting R. 3:21-4(f)). In Ferguson, we concluded the sentencing court erred by failing to explain why it was imposing a fine and "did not articulate any consideration of defendant's ability to pay the fine or the burden that payment might have upon him." Ibid.

Here, the trial court found defendant could pay the restitution imposed based on his work history and future ability to earn money, despite his twenty-five-year sentence. See Orji, 277 N.J. Super. at 589. We see no basis on which to disturb that decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2031-21